**RE/MAX INTERNATIONAL,
et al., Plaintiffs,**

v.

**REALTY ONE, INC., et al., Defendants.**

No. 1:94 CV 0062.

United States District Court,
N.D. Ohio,
Eastern Division.

May 10, 1995.

Stephen J. Squeri, Charles D. Weller, Elizabeth A. Grove, Jones, Day, Reavis & Pogue, Cleveland, OH, for Re/Max Intern., Inc., A.E.B.T.S., Inc., T.M.A.T.N.B., Inc.

Stephen J. Squeri, Elizabeth A. Grove, Jones, Day, Reavis & Pogue, Cleveland, OH, for D.F.I., Inc., Joseph P. Grady, Inc., McGrew Realty, Inc., Property Professionals, Inc.

Edward W. Cochran, Shaker Heights, OH, George Cochran, Streetsboro, OH, for Re/Max Northeast Ohio Ltd. Partnership, Zames Realty, Inc., Realty Properties, Inc., True Independence Partnership.

Richard M. Markus, David R. Cohen, Porter, Wright, Morris & Arthur, Cleveland, OH, for Realty One, Inc.

Thomas Ignatius Michals, John J. Eklund, Philip J. Carino, Nicholas A. Rossi, Calfee, Halter & Griswold, Cleveland, OH, for Smythe Cramer Co.

M. Neal Rains, Arter & Hadden, Cleveland, OH, for M. Neal Rains.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................... 140

II. MOTION FOR JUDGMENT ON THE PLEADINGS FOR FAILURE TO STATE A CLAIM .................................................................. 143

III. DISMISSAL FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6) ........ 143

IV. REALTY ONE'S ANTITRUST ALLEGATIONS .................................... 144

V. ANTITRUST INJURY AND STANDING TO SUE UNDER § 4 OF THE CLAYTON ACT ................................................................. 145

 A. Antitrust Injury: A Proper Claim ........................................... 145
 B. Antitrust Standing: A Proper Party .......................................... 146

VI. CONSPIRACY TO RESTRAIN TRADE UNDER § 1 OF THE SHERMAN ACT ..... 148

VII. CONSPIRACY TO MONOPOLIZE UNDER § 2 OF THE SHERMAN ACT .......... 152

VIII. THE RECRUITMENT OF SALES AGENTS BY RE/MAX ......................... 155

## TABLE OF CONTENTS

IX. AGREEMENTS ON BROKER–TO–BROKER COMMISSION SPLITS ............... 156

X. DISPARAGEMENT ..................................................... 159

XI. SHAM LITIGATION .................................................. 159

XII. REALTY ONE'S STATE LAW CLAIMS ...................................... 161

XIII. THE ANTITRUST STANDING OF RE/MAX INT'L ............................ 162

 A. Antitrust Injury.......................................................162
 B. Antitrust Standing ...................................................163
 1. The Market for Residential Real Estate Services in Northeast Ohio............164
 2. The Market for the Recruitment and Retention of Residential Real Estate
 Agents .....................................................................169

XIV. CONCLUSION ..................................................... 170

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

Plaintiffs, Re/Max International, Inc. ("Re/Max Int'l") and associated franchisees, A.E.B.T.S., Inc. ("Re/Max Crossroads"), and T.M.A.T.N.B., Inc. ("Re/Max Affinity"), filed a ten-count complaint against Defendants Realty One, Inc. ("Realty One") and Smythe, Cramer Company ("Smythe Cramer") asserting federal subject matter jurisdiction pursuant to 28 U.S.C. § 1337. Plaintiffs amended their complaint to join four additional Re/Max Int'l franchisees as plaintiffs—D.F.I., Inc. ("Re/Max Results"), Joseph P. Grady, Inc. ("Re/Max Xpress Realty"), McGrew Realty, Inc. ("Re/Max Key Realty"), and Property Professionals, Inc. ("Re/Max Property Professionals"); but the substance of the complaint's allegations remained the same (Docket 14). In addition to this initial group of seven, five more entities have since intervened as plaintiffs: Re/Max Northeast Limited Partnership ("Re/Max NE Ohio"), Zames Realty, Inc. ("Zames Realty"), Realty Properties, Inc., ("Realty Properties"), True Independence Partnership ("True Partnership"), and R.E.P., Inc. ("REP"). This second group of five has set forth its claims in the Second and Third Amended Complaints (Dockets 99 & 147).

Plaintiffs seek private enforcement of the antitrust laws pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, due to Realty One's and Smythe Cramer's alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Plaintiffs also pursue pendent state law claims for violations of the Valentine Act, Ohio Revised Code § 1331.01 *et seq.;* the Ohio Deceptive Trade Practices Act, Ohio Rev.Code § 4165.01 *et seq.;* and for tortious interference with potential business relations. Plaintiffs assert supplemental jurisdiction under 28 U.S.C. § 1367.

In particular, the First, Second and Third Amended Complaints assert the following similar claims: Count I, conspiracy to restrain trade in violation of § 1 of the Sherman Act against Realty One and Smythe Cramer; Count II, conspiracy to monopolize in violation of § 2 of the Sherman Act against Realty One and Smythe Cramer; Count III, unlawful monopolization under § 2 of the Sherman Act against Realty One; Count IV, unlawful attempt to monopolize under § 2 of the Sherman Act against Realty One; Count V, unlawful monopolization under § 2 of the Sherman Act against Smythe Cramer; Count VI, unlawful attempt to monopolize under § 2 of the Sherman Act against Smythe Cramer; Count VII, unlawful formation of trusts under Ohio's Valentine Act against Realty One and Smythe Cramer; Count VIII, deceptive trade practices under Ohio's Deceptive Trade Practices Act against Realty One and Smythe Cramer; Count IX, unfair competition under Ohio law against Realty One and Smythe Cramer; and Count X, tortious interference with potential business relations under Ohio law against Realty One and Smythe Cramer.

Realty–One counterclaims against Plaintiffs for violations of Sections 1 and 2 of the Sherman Act, and for tortious interference with business relations and unfair competition under Ohio law. Smythe Cramer counterclaims against Plaintiffs for a declaratory judgment on the validity of various actions taken by it in this dispute. Plaintiffs have filed replies to those counterclaims denying their validity.

Re/Max Int'l, its associated franchisees and other intervening plaintiffs claim that Realty One and Smythe Cramer have engaged in anticompetitive conduct to prevent the expansion of the "Re/Max 100% Concept" and the creation of additional Re/Max affiliates in Northeast Ohio. Re/Max Int'l is a franchisor of a real estate broker business system. Re/Max franchises have established themselves nationwide including in Northeast Ohio. Realty One and Smythe Cramer are long-established real estate brokerage firms which do significant business in Northeast Ohio. Neither Realty One nor Smythe Cramer franchise their way of doing business. Plaintiffs contend that ever since they entered in the Northeast Ohio market place, Realty One and Smythe Cramer, collectively and individually, have refused to deal with them through the implementation of anticompetitive practices. Plaintiffs claim that they have been the victims of unlawful punitive, adverse commission splits. The practice of "commission splitting" in the real estate business is one that has apparently gained some acceptance in the residential real estate market in Northeast Ohio and might be summarized as follows:

Prospective home buyers approach a real estate broker to express an interest in buying a home. The real estate broker or his or her sales agent tells the home buyers that there will be no extra charge for his or her services in finding a suitable home under certain circumstances. At that point the broker presents the home buyers with two choices. One, as an agent or subagent of home sellers, the broker can show homes which are listed on the multiple listing service or "MLS." If a purchase of a MLS home is made, the broker as the agent or subagent for the home sellers will receive a percentage of the buyers' purchase price as a commission. In a case where a MLS home has been listed in the first instance with another realtor, the broker will receive a partial share of the commission, a "commission split," which is divided between the listing realtor and the broker as the listing realtor's subagent.

The second choice is that the broker may offer to act as the buyers' agent. As a buyers' agent, the broker may also use the MLS system to locate suitable homes, but the broker no longer acts as an agent or subagent for the sellers. Nevertheless, as in the previous case, the buyers' broker still expects to receive the full compensation for his or her services from a portion of the purchase price as a commission. In order to accomplish this arrangement, the buyers' broker obtains an agreement with the sellers' broker to receive a cut of the commission which the sellers' broker receives from the purchase price. The sellers' broker does not keep all of that commission percentage for himself or herself, instead the sellers' broker gives the buyers' broker a "split" of the commission tendered. The amount of this split is often posted on the MLS system. The end result is that the buyers pay the retail price for a home. The sellers receive the retail price less the commission they pay their broker. And the sellers' broker splits the commission with the buyers' broker.

In both instances, whether acting as the sellers' broker or the buyers' broker, the expectancy is that the real estate broker gets paid for his or her services from a percentage of the purchase price as a direct commission, or from a commission split with another broker. Re/Max franchisees emphasize the buyers' broker aspect of the real estate business although they do act sellers' brokers as well. Realty One brokers use both the sellers' broker and buyers' broker systems while Smythe Cramer brokers do not act as buyers' brokers. Plaintiffs claim that Re/Max brokers and sales agents gain an advantage over their competitors through the Re/Max compensation structure which allows Re/Max brokers and agents to keep up to 100% of any commissions earned thereby rewarding high productivity. Plaintiffs also claim that

Re/Max affiliates gain a competitive advantage through emphasis on the buyers' broker approach to the real estate business.

Plaintiffs claim that whenever they as buyers' agents deal with Realty One and Smythe Cramer on the sale of residential real estate for which Realty One or Smythe Cramer act as the sellers' agents, Realty One and Smythe Cramer insist on a more unfavorable commission split with Re/Max brokers than they do with non-Re/Max franchisees. As well, Re/Max Int'l claims that this practice of imposing adverse splits against those brokers who choose to affiliate with Re/Max has illegally thwarted the expansion and creation of additional Re/Max franchises. The damages which flow from the imposition of these "adverse" commission splits form the basis for this lawsuit.

The Court has several motions at issue before it: Plaintiffs' motion for judgment on the pleadings on the counterclaims of Realty One for failure to state a claim upon which relief can be granted or for summary judgment (Docket 17–1 & 17–2); Realty One's motion for partial summary judgment against Re/Max Int'l (Docket 54); and Smythe Cramer's motion for partial summary judgment against Re/Max Int'l (Docket 87).

First, Plaintiffs move to dismiss Realty One's first, second and third counterclaims; or in the alternative move for summary judgment on Realty One's first counterclaim to the extent this counterclaim asserts allegations of monopolization or attempted monopolization under Section 2 of the Sherman Act (Docket 17–1 & 17–2); and to the extent this counterclaim asserts claims of conspiracy to restrain trade and monopolize under Sections 1 and 2 of the Sherman Act (Docket 81 & 103). *See* Fed.R.Civ.P. 12(c) & 56(c). Plaintiffs submit a supplemental memorandum in support (Docket 81), Realty One a memorandum in opposition (Docket 90), and Plaintiffs a reply (Docket 103). As well, Realty One filed a rebuttal (Docket 107), and Plaintiffs a sur-reply (Docket 110).[1]

Second, Realty One moves for partial summary judgment against Re/Max Int'l on all counts asserted against it on the grounds that Re/Max Int'l lacks antitrust standing and its claims are barred by the applicable statute of limitations (Docket 54–1 & 54–2). Re/Max Int'l submits a memorandum in opposition (Docket 77) to which Realty One has filed a reply (Docket 91).

Third, Smythe Cramer moves for partial summary judgment against Re/Max Int'l on Counts I, II, V, VI, VII, IX and X on the grounds that Re/Max Int'l lacks antitrust standing (Docket 87). Re/Max Int'l submits a memorandum in opposition (Docket 113). Smythe Cramer has filed a reply (Docket 124) to which Re/Max Int'l has filed a rebuttal (Docket 130).

The Court entertained oral argument on the pending motions on March 14, 1995. *See*

---

1. Realty One originally filed three counterclaims against "Re/Max" and "its independent franchisee co-conspirators." (Docket 9). All seven of these original plaintiffs filed their joint reply to Realty One's counterclaims several days before the amended complaint permitted four of those plaintiffs to participate (Docket 12). By separate motion of March 9, 1994, Plaintiffs moved for judgment on the pleadings or in the alternative for summary judgment with respect to Realty One's counterclaims (Dockets 17 & 18). Due to the early timing of Plaintiffs' alternative motion for summary judgment, however, the Court granted Realty One leave until August 15, 1994 to respond (Docket 26).

Instead of responding to Plaintiffs' motions, Realty One moved to amend its counterclaims on July 18, 1994 (Docket 48). After considering the positions of the parties, the Court allowed Realty One to amend its counterclaims as of August 19, 1994 (Docket 61) rendering much of Plaintiffs' motion for judgment on the pleadings moot as prematurely filed. *See* Order of August 19, 1994,

slip op. at 2 (Docket 60). Because of the amendment, the Court allowed Plaintiffs and Realty One additional time to supplement their positions on Plaintiffs' dispositive motions. *Id.* at 2–3.

Initially, Plaintiffs did not file a formal reply to Realty One's amended counterclaims, Fed. R.Civ.P. 7(a), 12(a)(2) & 15(a); but they did file a supplemental memorandum in support requesting that Realty One's amended counterclaims be dismissed in their entirety or that summary judgment be granted (Docket 81). With leave of court, Plaintiffs filed their reply on March 15, 1995 (Docket 145). Realty One filed its supplemental memorandum in opposition to Plaintiffs' motions on November 4, 1994 (Docket 90). Plaintiffs filed their reply on November 23, 1994 (Docket 103). The Court granted Realty One the opportunity to file a rebuttal which was done on December 6, 1994 (Docket 107). Plaintiffs filed their sur-reply on December 12, 1994 (Docket 110); thus bringing the motions at issue after the passage of almost nine months.

Tr. of Argument, Docket 151. Re/Max Int'l submitted supplemental affidavits in support of its position (Docket 143). As well, Re/Max Int'l (Docket 156), Realty One (Docket 154) and Smythe Cramer (Docket 157) submitted post-argument briefs.

For the reasons set forth below, Plaintiffs' motion for judgment on the pleadings for failure to state a claim is granted to the extent that Realty One's first counterclaim asserts allegations of monopolization, attempted monopolization or conspiracy to monopolize under Section 2 of the Sherman Act; but denied to the extent that the first counterclaim alleges a conspiracy to restrain competition or to engage in sham litigation in violation of Section 1 of the Sherman Act. As well Plaintiffs' motion to dismiss is denied as to Realty One's second counterclaim for interference with business relations and Realty One's third counterclaim for unfair competition under Ohio law. Plaintiffs' alternative motion for summary judgment on Realty One's Sherman Act Section 1 claims for conspiracy to restrain competition and Realty One's claims of interference with business relations and unfair competition under Ohio law is denied without prejudice as premature. Likewise, Realty One's motion for partial summary judgment against Re/Max Int'l on the statute of limitations defense is denied without prejudice as premature. Finally, Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on the issue of antitrust standing are denied to the extent that Re/Max Int'l assert a private enforcement actions under § 4 of the Clayton Act for damages flowing from the alleged injury inflicted on the market for the recruitment and retention of real estate sales agents or brokers in Northeast Ohio. Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on Re/Max Int'l's state law claims contained in Counts VIII, IX and X of the Amended Complaint are denied without prejudice as premature.

## II. MOTION FOR JUDGMENT ON THE PLEADINGS FOR FAILURE TO STATE A CLAIM

After the pleadings are closed, a party may move to dismiss for failure to state a

claim upon which relief can be granted by motion for judgment on the pleadings. Fed. R.Civ.P. 12(h)(2). Unlike a motion to dismiss which ordinarily is filed in the first instance in lieu of an answer under Rule 12(b), a motion for judgment on the pleadings comes after the pleadings are closed and after a "responsive pleading," as defined by Rule 7(a), has been served. Whereas a plaintiff, cross-claimant or counter-claimant typically could amend his allegations pursuant to Rule 15(a) without leave of court when faced with a 12(b)(6) motion to dismiss, moving to dismiss under Rule 12(h)(2) forces the pleader to seek leave of court before he can remedy his defective allegations. Where leave of court is denied, dismissal may be granted under Rule 12(b)(6) even though the pleader has realized too late the manner in which his allegations might be remedied.

Such maneuverings under Rule 12(h)(2) should be scrutinized carefully to determine whether a party has attempted to frustrate Rule 12 which requires that any of the Rule 12(b) defenses "shall be made before pleading if a further pleading is permitted." Where, as here, a party has moved for judgment on the pleadings a short eight days after it has filed its reply to the original counterclaim, due consideration should be given to a later-filed motion seeking leave to amend. In this case the Court has struck a balance between the provisions of Rule 12(b) and 12(h)(2) by allowing Realty One the opportunity to amend its counterclaims. Thus framed, "[w]here the Rule 12(b)(6) defense is raised by a Rule 12(c) motion for judgment on the pleadings, [the court] must apply the standard for a Rule 12(b)(6) motion...." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir.1987).

## III. DISMISSAL FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hi-*

*shon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted)). When a complaint is challenged under Rule 12(b)(6) its allegations should be construed favorably to the plaintiff, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); and its factual allegations, as "construed as to do substantial justice," Fed.R.Civ.P. 8(f), must be accepted as true. *See United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991); *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232–33; *Conley,* 355 U.S. at 48, 78 S.Ct. at 103. *See also Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976) ("take as true the material facts alleged"). Except for "two specific instances" as provided by Rule 9(b) for fraud and mistake, "notice pleading" under Rule 8(a) does not require greater particularity. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (allegations of municipal liability under 42 U.S.C. § 1983). The sufficiency of a complaint, however, is a question of law, *Dugan v. Brooks,* 818 F.2d 513, 516 (6th Cir.1987), and the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987) (citations omitted).

## IV. REALTY ONE'S ANTITRUST ALLEGATIONS

Realty One alleges that Re/Max Int'l, its independent regional directors, franchisees, subfranchisees, and their respective sales associates, as constituting the largest residential real estate brokerage system in the United States, targeted the Northern Ohio metropolitan area with a conspiracy designed to destroy local competition in the business of listing and selling real estate. (Am.Countercl. ¶¶ 1, 2, 5 & 6). Realty One claims that this conspiracy, which is designed to "weaken, destroy and eliminate existing and potential competition, including Realty One, and to monopolize trade and commerce in the brokerage of residential real estate for targeted metropolitan markets in the United States . . . ," violates Sections 1 and 2 of the Sherman Act. (Am.Countercl. ¶ 7). Realty One contends that Re/Max and its franchise system possess monopoly power or a dangerous potential for achieving monopoly power in those metropolitan residential real estate markets which they target. (Am.Countercl. ¶ 7).

According to Realty One, the members of the conspiracy accomplish the destruction of local competition by "lur[ing] top producing sales agents away from established local brokers with deceptive and misleading claims, while collectively discouraging Re/Max brokers from recruiting sales agents from each other." (Am.Countercl. ¶ 9). The inducement comes from a collective agreement among the conspirators that all Re/Max brokers pay their respective sales agents 95% to 100% of the brokerage commissions for transactions in which those sales agents participate. (Am.Countercl. ¶¶ 13 & 15). This recruitment apparently has deprived Realty One of the competitive value that Realty One has invested in those sales agents as well as the customer lists, contacts and confidential business practices to which those sales agents were privy. (Am.Countercl. ¶ 9). Realty One alleges that to gain market dominance the conspirators disparage local brokers, disparage new or part-time sales associates associated with local brokers, and interfere with listing contracts. (Am.Countercl. ¶¶ 10 & 11).

As well, Realty One alleges that the conspirators collectively agreed upon the compensation that Re/Max brokers would pay other brokers for cooperative transactions. (Am.Countercl. ¶ 12). According to Realty One the collective agreements on these broker-to-broker commission splits raise and stabilize the price of real estate broker services in a *per se* unlawful manner. (Am.Countercl. ¶ 14).

Finally, Realty One alleges that the conspirators, in order to achieve their plan for market dominance, have agreed to, and have then instituted, an uninterrupted program of meritless judicial proceedings against Realty One; and have incited a series of groundless

government investigations without probable cause. (Am.Countercl. ¶¶ 17 & 18). All of this, according to Realty One, has injured and hindered it in its ability to recruit and retain "successful" sales agents. Realty One adds damage claims for lost proprietary information, lost brokerage commission profits, lost resources from defending baseless litigation and plaintiff-induced investigations, and lost reputation and goodwill. (Am.Countercl. ¶ 19).

## V. ANTITRUST INJURY AND STANDING TO SUE UNDER § 4 OF THE CLAYTON ACT

 Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, are broadly worded statutes designed to counter restraints of trade and monopolistic practices;[2] but are actionable by private individuals only through Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Section 4 of the Clayton Act allows private enforcement of the antitrust laws through a treble damages action by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15. Those who do not qualify for Clayton Act standing may not bring a private damage action for antitrust violations. *Cf. Kansas v. Utilicorp United Inc.,* 497 U.S. 199, 204, 110 S.Ct. 2807, 2810–11, 111 L.Ed.2d 169 (1990); *id.* at 219, 110 S.Ct. at 2818 (White, J., dissenting) (stating that it was inappropriate for the majority to deny plaintiff "standing to sue under § 4 of the Clayton Act"). Moreover, "[a] showing of

antitrust injury is necessary, but not always sufficient, to establish standing under § 4 [of the Clayton Act]." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986) (citing Page, *The Scope of Liability for Antitrust Violations,* 37 Stan.L.Rev. 1445, 1483–85 (1985)). Where the parties challenge standing at the pleading stage, the court "must examine the allegations contained in the complaint" to determine first whether the plaintiff has presented a proper claim for antitrust injury before asking whether the plaintiff is the proper party to bring suit. *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448–49 (11th Cir.1991) (citing in part *Austin v. Blue Cross & Blue–Shield of Ala.,* 903 F.2d 1385, 1387 (11th Cir.1990) (motion to dismiss) and citing *Cargill, supra* ). Courts should not confuse antitrust injury with antitrust standing because although the two concepts share a common ingredient, an inquiry into antitrust injury "is more limited than one to determine whether the plaintiff has standing." *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105, 1110–11 (6th Cir.) (citations omitted), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989).[3]

### A. *Antitrust Injury: A Proper Claim.*

In order to state a claim for "antitrust injury," a private plaintiff must sue for injury that "is of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50

---

**2.** Section 1 of the Sherman Act condemns "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." as illegal. 15 U.S.C. § 1.
Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

**3.** At the summary judgment stage or at trial, the inquiry turns from the allegations to the evidence. At that time, proof of antitrust injury which is necessary to prove a party's standing to bring a private cause of action blurs with proof of the substantive elements of the underlying

offense itself. Failure to prove either antitrust injury or standing would result in judgment for the defendant as a matter of law. *Compare Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582–98, 106 S.Ct. 1348, 1353–62, 89 L.Ed.2d 538 (1986) (after concluding that several of respondents' allegations did not state a claim for antitrust injury, the Court analyzed respondents' remaining claim of antitrust injury in the summary judgment context) *with Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 524–26 & 545–46, 103 S.Ct. 897, 901–02 & 912–13, 74 L.Ed.2d 723 (1983) (affirming the district court's dismissal of plaintiff as without standing to sue under Clayton Act § 4 based on the allegations contained in the amended complaint).

L.Ed.2d 701 (1977).[4] An "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny...." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (summarizing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986)). The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Atlantic Richfield*, 495 U.S. at 342, 110 S.Ct. at 1893–94. In short, a private plaintiff can recover on an antitrust claim only for a loss which "stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344, 110 S.Ct. at 1894. "For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984) (footnote omitted).[5] As the Sixth Circuit has stated:

Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Lively legal competition will result in the efficient and shred businessman routing the inefficient and imprudent from the field. The antitrust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors.

*Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir.1982).

**B. Antitrust Standing: A Proper Party.**

 A challenge to the "standing" of a party is primarily a challenge to the limited jurisdiction of federal courts "to decide the

4. The distinction between a party's standing and the validity of his or her alleged cause of action under the antitrust laws is subtle but important. In *Brunswick* plaintiff claimed the breach of substantive rights guaranteed under the antimerger provisions of Clayton Act § 7, 15 U.S.C. § 18. 429 U.S. at 480, 97 S.Ct. at 693. After trial, the defendants appealed an adverse judgment by questioning whether antitrust damages were available where the sole injury resulted from mergers that kept competitors in business. *Id.* at 484, 97 S.Ct. at 695. The Court noted that Clayton Act § 4, 15 U.S.C. § 15, differs from § 7 in that § 4 is "primarily," but not exclusively, a remedy provision. *See id.* at 486, 97 S.Ct. at 696. Significantly, the Court read a substantive requirement into private causes of action seeking damages by virtue of § 4 which goes beyond mere proof that plaintiff sustained "injury causally linked to an illegal presence in the market." *Id.* at 489, 97 S.Ct. at 697.

As the Court stated, "to recover damages respondents must prove more than that petitioner violated § 7, since such proof establishes that injury *may* result." *Id.* at 486, 97 S.Ct. at 696 (emphasis added). That "additional proof" requirement originated from the Court's reading of § 4 to provide relief only for injuries of "'the type that the statute was intended to forestall.'" *See id.* at 487–88, 97 S.Ct. at 697 (quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967) which held that criminal penalties for negligently sinking a ship were not exclusive and that a civil negligence action would be implied "[b]ecause the interest of the plaintiffs ... fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall[.]"). Significantly, the *Brunswick* Court granted judgment notwithstanding the verdict holding that plaintiffs did not prove a claim at trial upon which relief could be granted. 429 U.S. at 490, 97 S.Ct. at 698. Nowhere did the Court imply that the competitor bowling alleys were not proper parties to bring their Clayton Act § 7 antimerger suit. Thus apart from a party's standing to sue under the *Associated General Contractors* test, *infra*, a party will fail to state an antitrust cause of action whenever it fails to satisfy the two-pronged "antitrust injury" test enunciated in *Brunswick*. *See* 429 U.S. at 489, 97 S.Ct. at 697–98.

5. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–86, 106 S.Ct. 1348, 1353–56, 89 L.Ed.2d 538 (1986) (finding that plaintiff did state a claim for antitrust injury arising from an alleged conspiracy to monopolize the American market through predatory pricing under § 1 of the Sherman Act, but that plaintiff failed to state an antitrust claim for injuries arising from the cartelization of a foreign market, agreements to charge higher than competitive prices, or conspiracies to impose nonprice restraints that raise the price or limit the output of defendants' products).

merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Generally, parties have "standing" to have their disputes adjudicated in federal court pursuant to the constraints of the "case and controversy" requirement of Article III, Section 2 of the United States Constitution, only if those parties allege and then establish an "injury in fact," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982), which is not "abstract," "conjectural," or "hypothetical," but rather, "distinct and palpable." *Allen v. Wright,* 468 U.S. 737, 751–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Although standing "subsumes a blend of constitutional requirements and prudential considerations," *Valley Forge,* 454 U.S. at 471, 102 S.Ct. at 758, prudential considerations are not considered if Congress creates statutory standing that it intends to extend to the full limits of Article III. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979). In the case of the antitrust laws, the Supreme Court has interpreted the Clayton Act to limit statutory standing to parties fewer than would be allowed by full extent of Article III. *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534–46 & 535 n. 31, 103 S.Ct. 897, 906–13 & 907 n. 31, 74 L.Ed.2d 723 (1983) (identifying judge made rules limiting persons entitled to sue under § 4 of the Clayton Act). *See also Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972).[6]

▪ In particular, when analyzing whether a plaintiff falls within that class of persons who have standing to sue under Section 4 of the Clayton Act, the court considers several factors that are to be balanced, with no single factor being conclusive. *Peck v. General Motors Corp.,* 894 F.2d 844, 846 (6th Cir.1990) (citing *Province v. Cleveland Pub-*

*lishing Co.,* 787 F.2d 1047, 1051 (6th Cir. 1986)). The court considers:

"(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation."

*Bodie–Rickett & Assocs. v. Mars, Inc.,* 957 F.2d 287 (6th Cir.1992) (quoting *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.1983) and citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Furthermore, given the relevance of the connection between a plaintiff and an alleged antitrust violation to the standing inquiry, the Court must appreciate the elements of the alleged violation before any standing analysis would be complete. *Cf. Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 395 n. 7 (7th Cir.1993) (noting that there is "some logic" to the interpretation that "a plaintiff may not have 'standing' unless he can satisfy each requirement of the § 4 action—antitrust violation, antitrust injury and proximate cause"—but for purposes of clarity treating antitrust injury as a separate proposition), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994).

▪ In its Amended Counterclaim, Realty One alleges that "Re/Max International, Inc." and "its independent franchisees and subfranchisees, including the plaintiffs" engaged in a conspiracy to restrain competition and to monopolize in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The Court finds that the Amended Counterclaim gives fair notice only of illegal anti-

---

6. *Compare also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111 & n. 6, 107 S.Ct. 484, 490 & n. 6, 93 L.Ed.2d 427 (1986) (applying the antitrust injury concept to Clayton Act § 16 but

stating that the standing analysis under § 16 will not always be identical to the standing analysis under § 4).

trust conspiracies. *Compare* Realty One's Mem.Opp'n at 7 & 19 (Docket 90) *with id.* at 8. To the extent that other antitrust claims might lead to a different result in the non-conspiracy context, the Court finds that such claims were abandoned with Realty One's amendment and have not been plead in the latest pleading in accordance with the requirements of Federal Rule of Civil Procedure 8.

## VI. CONSPIRACY TO RESTRAIN TRADE UNDER § 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act, 15 U.S.C. § 1, applies to any "contract, combination ..., or conspiracy" between two or more persons to restrain trade in interstate commerce. Only unreasonable restraints, however, constitute unlawful conduct under § 1. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). As such, market conduct generally is analyzed under a "rule of reason" to determine whether "the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).[7]

Significantly, "[c]ourts have discerned two major types of antitrust conspiracies to restrain trade: horizontal and vertical. Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade.... Vertical conspiracies, on the other hand, involve agreements between competitors at different levels of competition to restrain trade...." *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 805 (6th Cir.1988) (citing *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978)). "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anti-competitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (citing *Northern Pacific R.R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).[8] Most other agreements, however, "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Id.* These other agreements such as joint ventures and various vertical agreements are judged under a "rule of reason" which entails "[1] an inquiry into market power and [2] market structure designed to assess the combination's actual effect." *Id.* (citing in part *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). *See also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (discussing circumstances when the *per se* rule does not apply in the horizontal context). The rule of reason inquiry "focuses directly on the challenged restraint's impact on competitive conditions." *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). "Since different antitrust principles apply depending on whether a given restraint of trade is either horizontal or vertical, classification is thus critically important." *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 806 (6th Cir.1988).

7. "To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

8. In those horizontal price-fixing cases where the *per se* rule applies, the only inquiry is whether there was an agreement to restrain trade, since the unreasonableness of the restraint is conclusively presumed regardless of whether the rule of reason would lead to a different result. *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982) (citing *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940) and *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927)).

"The essential elements of a violation of Section 1 of the Sherman Act are: 1) a contract, combination or conspiracy; 2) affecting interstate commerce; 3) which imposes an 'unreasonable' restraint on trade." *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983) (citing *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir.1982) and *Davis–Watkins v. Service Merchandise*, 686 F.2d 1190, 1195–96 (6th Cir.1982)). When the effect on interstate commerce is not an issue and a *per se* rule does not apply, the Sixth Circuit requires a more in-depth inquiry into the allegations of unreasonable restraint of trade.

To establish a [rule-of-reason] claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195–96 (6th Cir.1982) (explanatory text added) (following the four-element test formulated in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982)). *Accord Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991); *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir.1983).[9]

▮▮▮▮ Of course it has been recited that " '[i]n essence plaintiffs must demonstrate that the alleged . . . conspiracy had either an unlawful purpose or an anticompetitive effect.' " *Stratmore v. Goodbody*, 866 F.2d 189, 191 (6th Cir.1989) (citing *Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.*, 715 F.2d 1115, 1118 (6th Cir.1983) and *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978)). But the significance of this *dictum* appears to vary depending on the context in which it is employed. Certainly, it does not change the explicit rule-of-reason analysis repeatedly stated in *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) that the rule of reason "focuses directly on the challenged restraint's *impact* on competitive conditions;" *id.* at 688, 98 S.Ct. at 1363 (emphasis added); or that unreasonableness under either a *per se* rule or a rule of reason "is confined to a consideration of *impact* on competitive conditions." *Id.* at 690, 98 S.Ct. at 1365 (emphasis added). Thus commentators have stated that despite such statements that proof of a § 1 violation may be made by proof of either an unlawful purpose *or* an anticompetitive effect, "there is a question as to whether an anticompetitive intent, standing alone, establishes an unreasonable restraint of trade under the rule of reason. . . . The Second Circuit has indicated that it 'doubts' that anticompetitive purpose or effect 'is a disjunctive rule' and stated that 'it is difficult to conceive of a viable private action for damages under section 1 if some unreasonable restraint has not been effected.' *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 397 & n. 4 (2d Cir.1980)." James R. Loftis, et al., *Antitrust Law Developments* 20–21 (2d ed. 1984) (other footnotes omitted). Indeed, the very requirement of antitrust "injury" would appear to be circumvented if proof of § 1 rule-of-reason case could be made on the

---

9. The Sixth Circuit has not been uniform in its summary of the required elements of a Sherman Act § 1 claim. *Compare Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.*, 715 F.2d 1115, 1118 (6th Cir.1983) (reciting a two-element test and citing *Smith v. Northern Mich. Hosps., Inc.*, 703 F.2d 942, 949 (6th Cir.1983) and *Davis–Watkins, supra*) *and Stratmore v. Goodbody*, 866 F.2d 189, 191 (6th Cir.1989) (following the two-element test of *Continental Cablevision, supra*) *with White & White, Inc. v.* *American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983) (reciting a three-element test and citing *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir.1982) and *Davis–Watkins, supra*) *and Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 568 (6th Cir.1992) (citing *White & White*). The difference appears to be that the more abbreviated versions of the test refer in general to "unreasonable" restraints of trade, and thereby encompass both *per se* and rule-of-reason violations of § 1.

existence of unlawful intent alone. *Cf. Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 1894, 109 L.Ed.2d 333 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or *effect* of the defendant's behavior.") (second emphasis added). *See also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, —— U.S. ——, ——, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the antitrust laws.").[10] Thus, where a rule-of-reason case is presented in the Sixth Circuit, a showing of "adverse anticompetitive effects" or, in the appropriate case, "facts which radiate a potential for future harm" to competition, is required. *Compare Davis–Watkins*, 686 F.2d at 1195 & 1202; *Richter*, 691 F.2d at 827 ("For a restraint to be unreasonable, it must have an anticompetitive effect.") (citing *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1183 (D.C.Cir.1978)) *with Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 622, 73 S.Ct. 872, 887–88, 97 L.Ed. 1277 (1953). *See also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986) (where agreements are not *per se* violations, the court analyzes whether the action "has the potential for genuine adverse effects on competition," which usually involves an inquiry "into market definition and market power.").[11] It follows that insufficient allegations of anticompetitive effect will justify the dismissal of a § 1 antitrust claim. *See Crane & Shovel*, 854 F.2d at 805 (citing with approval *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 557 (7th Cir.1980)).

Anticompetitive effect or impact does not exist in a vacuum, however. "An anticompetitive or procompetitive effect must be judged in relation to a market, for it is in that conceptual space that competition takes place." *Consultants & Designers*, 720 F.2d at 1562. Thus, "[t]he starting point in a rule of reason case is to identify the relevant

10. The Supreme Court recently reiterated the anticompetitive purpose-or-effect rule in the disjunctive in *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330–31, 111 S.Ct. 1842, 1847–48, 114 L.Ed.2d 366 (1991) with its quotation of *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 243, 100 S.Ct. 502, 509–10, 62 L.Ed.2d 441 (1980). In those cases, however, the Court limited its use of that disjunctive rule to the interstate commerce question. The Court used that rule to support its alternative holding that "respondent need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction." *Summit Health*, 500 U.S. at 331, 111 S.Ct. at 1848. But the question of federal jurisdiction is separate from the question of whether the underlying claim which supports jurisdiction fails to state a claim upon which relief can be granted. *E.g.*, *Bell v. Hood*, 327 U.S. 678, 681–82, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1946). Even the majority opinion in *United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969) which has been cited in support of the disjunctive rule actually rested its holding on the fact that "[t]he inferences [were] irresistible that the exchange of price information ... had an anticompetitive *effect* in the industry, chilling the vigor of price competition." *Id.* (emphasis added).

11. In *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) the Supreme Court found the Government's proof insufficient to support a § 1 conviction because "the Government ... [had] proved neither actual unlawful effects nor facts which radiate a potential for future harm." *Id.* at 622, 73 S.Ct. at 888. The Eleventh Circuit has read the *Times–Picayune* language as an alternative to its § 1 effects test. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir.1993). In light of the Supreme Court's recent statement that "proper [§ 1] analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful," *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330, 111 S.Ct. 1842, 1847, 114 L.Ed.2d 366 (1991), the *Times–Picayune* alternative would appear to be legitimate substitute to proof of anticompetitive effect in the appropriate case. *Compare also Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir.1992) (section 1 action could not be sustained where plaintiff had "not pled or suggested that he can show a naked restraint or an actual detrimental effect on competition flowing from the suspension of his staff privileges"); *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir.1982) ("Since the complaint does not allege facts suggesting that [defendant's] refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason case alleged."); *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 396 (7th Cir.1993) ("[A] plaintiff, to show a [§ 1] violation, must establish a contract, conspiracy or combination intended to restrain competition and which actually has an anticompetitive effect.") (citations omitted).

product and geographic markets. *See* W.C. Holmes, 1988 Antitrust Law Handbook, § 1.04[2], at 148–50. The relevant market is used to gauge market power, which in turn indicates the potential anticompetitive effect of a challenged restraint." *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir.1989). *See also Fleer Corp.*, 658 F.2d at 148 n. 13 ("The definition of a relevant product market is a necessary element of either a section 1 or 2 violation.") (citation omitted). As well, "[a] defendant must have market power before its conduct can be shown to have an adverse effect on competition," *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir.1985) (citing *Davis–Watkins*, 686 F.2d at 1202), although "proof of actual detrimental effects can obviate the need to prove the defendant's market power [in a rule-of-reason case]." *Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir.1992) (internal quotations and citations omitted) (explanatory text added).

■ It is important to remember that § 1 of the Sherman Act does not proscribe conduct that is "wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968)). "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement." *Fisher v. City of Berkeley*, 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986). Merely because a single firm or its divisions or wholly-owned subsidiaries engage in unreasonable restraints of trade, does not make those restraints actionable under § 1. As the Supreme Court explained, "[b]ecause the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct (short of

threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." *Copperweld*, 467 U.S. at 775, 104 S.Ct. at 2743–44.

■ Furthermore, the Supreme Court has held that "[a] § 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Copperweld*, 467 U.S. at 771, 104 S.Ct. at 2742 (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984) (citation omitted). The existence of an agreement must be proved and where there is no direct evidence of an explicit agreement, antitrust law limits the range of permissible inferences in cases based on circumstantial evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Such circumstantial evidence must reasonably "tend[ ] to exclude the possibility" that the alleged conspirators acted independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

■ Finally, there can be an unlawful antitrust conspiracy based on an agreement alone. The Supreme Court has stated that "the essence of any violation of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it...." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (citing *United States v. Kissel*, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910)).[12] Contrary to the general rule that

---

**12.** The Supreme Court in *United States v. Kissel*, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910) addressed the sufficiency of allegations that defendants engaged in an unlawful conspiracy to restrain the trade in refined sugar among the several States from December 30, 1903 to July 1, 1909. The Court rejected defendants' "special plea in bar" defense which challenged the sufficiency of the indictment as written on statute of limitations grounds. Even though the initial agreement may have been made more than three years before the date of the indictment, "[t]he

there must be allegations, and later proof, of an overt act taken in furtherance of an agreement before that agreement may be said to have matured into an unlawful conspiracy, the Sherman Act follows the early common law rule in that "it does not make the doing of any act other than the act of conspiring a condition of liability." *Nash v. United States*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913). *Accord United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 225 n. 59 & 252, 60 S.Ct. 811, 846 n. 59 & 857–58, 84 L.Ed. 1129 (1940). *Compare United States v. Shabani*, — U.S. —, —–––——, 115 S.Ct. 382, 384–86, 130 L.Ed.2d 225 (1994) (government need not prove the commission of any overt acts in furtherance of an unlawful drug conspiracy under 21 U.S.C. § 846 as the criminal agreement itself is the *actus reus*) *with Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir.1985) (defining the elements of a conspiracy in the civil rights context to include an overt act) *and* 42 U.S.C. § 1985(3) (outlawing acts causing injury in a conspiracy to deprive civil rights).

## VII. CONSPIRACY TO MONOPOLIZE UNDER § 2 OF THE SHERMAN ACT

 Section 2 of the Sherman Act deals with monopolistic practices and, where a conspiracy is alleged, § 2 reaches beyond unilateral activity to impose liability on concerted acts. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 n. 13, 104 S.Ct. 2731, 2739 n. 13, 81 L.Ed.2d 628 (1984); 15 U.S.C. § 2. "[Sections] 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap." *American Tobacco Co. v. United States*, 328 U.S. 781, 788, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946) (citing *United States v.*

*Socony–Vacuum Oil Co.*, 310 U.S. 150, 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129 (1940)). *But see* R. Posner, *Antitrust Law: An Economic Perspective* 216 (1976) ("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade, which violates section 1."). Although "those things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1[,] *Standard Oil Co. v. United States*, 221 U.S. 1, 61 [31 S.Ct. 502, 516, 55 L.Ed. 619 (1911),] ... that is not always true." *United States v. Griffith*, 334 U.S. 100, 106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Because § 2 reaches monopolies, attempts to monopolize, as well as conspiracies to monopolize, "it is ... monopoly power, whether lawfully or unlawfully acquired, [that] may itself constitute an evil and stand condemned under § 2 evn though it remains unexercised." *Griffith*, 334 U.S. at 106–07, 68 S.Ct. at 945. "So also a conspiracy to monopolize violates § 2 even though monopoly power was never acquired." *Griffith*, 334 U.S. at 107 n. 9, 68 S.Ct. at 945 n. 9 (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946)).

 Significantly, "[t]he [§ 2] offenses of monopolization, attempt to monopolize, and conspiracy to monopolize are distinct and require different proofs." *Potters Medical Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir.1986). Monopolization and attempted monopolization may be established by virtue of unilateral acts alone, but conspiracy to monopolize requires proof of concerted activity. *Id.* Where a conspiracy to monopolize is alleged, plaintiff must "prove both an existence of conspiracy and specific intent to monopolize." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir.1982) (citing *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir.

overt acts relied upon coming down to within three years of the indictment [were] alleged to have been done in pursuance of the conspiracy ..;" and thus were sufficient to charge a continuing conspiracy within the limitations period which could not be defeated by the special plea. *Id.* at 609–10, 31 S.Ct. at 126. It thus appears that the *Summit Health* Court cited *Kissel* for a proposition for which it does not stand. If the

essence of a § 1 violation was the illegal agreement itself and that was the basis of the *Kissel* Court's holding, then the defendant's special plea in bar defense should have prevailed. The *Summit Health* Court arguably should have cited the later case of *Nash v. United States*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913) for the proposition that an antitrust conspiracy can be based on an agreement alone.

1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982)). *See also Lewis v. Pennington*, 400 F.2d 806, 811 (6th Cir.) ("a specific intent to accomplish an unlawful result is necessary where monopoly power has not been obtained and the charge is an attempt or conspiracy to monopolize"), *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968).[13] Proof of specific intent to monopolize "may be shown by direct evidence or inferred from anticompetitive acts." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982) (applying the same specific intent requirement for claims of attempted monopolization to claims of conspiracy to monopolize).

 To prove a conspiracy to monopolize "it [is] not necessary to show power and intent to exclude all competitors, or to show a conspiracy to exclude all competitors," because § 2 prohibits efforts to "monopolize any part of the trade or commerce among the several states...." *American Tobacco Co.*, 328 U.S. at 789, 66 S.Ct. at 1129. Nor need an antitrust plaintiff who alleges a conspiracy to monopolize demonstrate defendant's dangerous probability of success as would be the case if an attempted monopolization claim were brought. *International Distribution Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795–96 n. 8 (2d Cir.1987). Instead, a § 2 conspiracy claim "'is a different offense from the crime that is the object of the conspiracy,'" and defendants might be convicted "of conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy, *i.e.*, to exclude actual and potential competitors from the [relevant market]." *American Tobacco Co.*, 328 U.S. at 789, 66 S.Ct. at 1129 (explanatory text added) (citations omitted). Although market power need not be shown for a conspiracy claim, such power is relevant ·to whether a particular defendant possessed a specific intent to monopolize. *See Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926–27 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

Courts have held, moreover, that "the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize" because "[a]ll lawful competition aims to defeat and drive out competitors." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir.1986) (citing *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.*, 551 F.2d 790, 795 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977)). Under this view the specific intent inquiry focuses on "predatory conduct" which is "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Great Escape*, 791 F.2d at 541 (citations omitted). *See also Association for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 585 & n. 11, 586 n. 13 (D.C.Cir.1984) (holding that the

---

**13.** Some courts and commentators have read a conspiracy to monopolize claim to require proof of an overt act. This precedent appears to be contrary to the holding of *Nash v. United States*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913) which seems to apply equally to a § 2 conspiracy. For cases requiring an overt act for a conspiracy to monopolize see *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir.1993); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir.1992); *Baxley–DeLamar Monuments, Inc. v. American Cemetery Ass'n*, 843 F.2d 1154, 1157 (8th Cir.1988); *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540–41 & n. 4 (7th Cir.1986) (noting that Kinter, *Federal Antitrust Law* 434 (1980) does not list the overt act as a requirement for a conspiracy to monopolize claim); *North Mississippi Communications, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir.1986); *Volvo North Am. Corp. v. Men's Int'l*

*Professional Tennis Council*, 857 F.2d 55, 74 (2d Cir.1988); James R. Loftis, *et al.*, *Antitrust Law Developments* 145 (2d ed. 1984).

Other courts have questioned whether proof of a specific intent to monopolize is necessary for proof of a § 2 conspiracy. *See Syufy Enters. American Multicinema, Inc.*, 793 F.2d 990, 1000–01 (9th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987) (questioning the specific intent requirement but holding that a judgment n.o.v. should have been granted in any event where there was no evidence that more than one of the alleged co-conspirators had some awareness that the underlying conduct was anticompetitive or monopolistic) (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 146–47, 68 S.Ct. 915, 923–24, 92 L.Ed. 1260 (1948) for the proposition that a § 1 conspiracy merely requires proof of acquiescence in conduct with knowledge that it was anticompetitive).

specific intent to monopolize "refers to a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means" and applying that specific intent test to plaintiff's claims of attempted monopolization and conspiracy to monopolize).

Some courts have opined, however, that since "[s]pecific intent to monopolize is the heart of a conspiracy charge, . . . a plaintiff is not required to prove what is the 'relevant market.'" *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir.1975) (following *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961)). Other courts have maintained that "a minimal showing must nonetheless be made as to the product and geographic context of the alleged conspiracy." *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1181–82 & 1193 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983). Another view is "that relevant market should be considered a necessary element of Section 2 conspiracy claims, at least in civil cases." *Alexander*, 687 F.2d at 1182 (citing Von Kalinowski, 3 *Antitrust Laws and Trade Regulation* § 9.02[4] (1982)). In *United States v. Yellow Cab Co.*, 332 U.S. 218, 226, 67 S.Ct. 1560, 1564–65, 91 L.Ed. 2010 (1947) the Supreme Court addressed the sufficiency of a complaint alleging a conspiracy to monopolize under § 2 and intimated that the market represented by the victims of the conspiracy was relevant. In another case, however, the Supreme Case summarized its analysis of the conspiracy to monopolize action presented in *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 560, 51 S.Ct. 248, 249–50, 75 L.Ed. 544 (1931) as one in which allegations of combination and conspiracy to monopolize were proven "and the scope of the market was not in issue." *See United States v. du Pont de Nemours & Co.*, 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 1007 n. 23, 100 L.Ed. 1264 (1956). Given these disparate precedents, the question of whether the plaintiff is required to prove the relevant market for a conspiracy to monopolize claim demands closer scrutiny.

■ In *Yellow Cab* the Supreme Court held that a failure by plaintiff to allege defen-dants' monopoly power or to allege "[i]ts relative position in the field of taxicab production [had] no necessary relation to the ability of the [defendants] to conspire to monopolize or restrain . . . an appreciable segment of interstate cab sales. An allegation that such a segment has been or may be monopolized or restrained is sufficient." 332 U.S. at 226, 67 S.Ct. at 1564–65. It is this passage dealing with the interstate commerce requirements of a conspiracy to monopolize claim that the court in *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961) found dispositive of its view that proof of a relevant market was unnecessary to a § 2 conspiracy. Significantly, however, the Supreme Court went on to add that there was no doubt that the combinations and conspiracies alleged in the *Yellow Cab* case were banned by the Sherman Act because those combinations or conspiracies "exclud[ed] all cab manufacturers other than CCM from that part of the market represented by the cab operating companies under their control. . . ." 332 U.S. at 226, 67 S.Ct. at 1565. It would appear, therefore, that apart from jurisdictional allegations going to a conspiracy's affect on an appreciable segment of interstate commerce, allegations of the specific intent required for a conspiracy to monopolize claim would make sense only if one could demonstrate a specific intent to achieve monopoly power in a relevant market. The case of *Story Parchment* is not to the contrary as in that case too there was sufficient proof to indicate that defendants combined and conspired to continue their "substantial monopoly of the interstate trade in parchment paper." 282 U.S. at 560, 51 S.Ct. at 249. Although perhaps a showing of the relevant market in a § 2 conspiracy need not be as rigorous as that required under § 1, a conspiracy to monopolize claim at least should "require a minimal showing of product and geographic context—upon what and where the alleged conspiracy is focused—to ensure that a claim is not based upon some abstract showing of unlawful intent." *Alexander*, 687 F.2d at 1182. *Compare also Bowen v. New York News, Inc.*, 522 F.2d 1242, 1258 (2d Cir.1975) ("An essential element of such a conspiracy is an intent to monopolize in the designated

segment of commerce."), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976).

With the doctrines of antitrust injury and antitrust standing and the contours of § 1 and § 2 conspiracy claims outlined, the Court can now turn to the sufficiency of Realty One's allegations set forth in its Amended Counterclaims.

## VIII. THE RECRUITMENT OF SALES AGENTS BY RE/MAX

Realty One complains initially that Re/Max Int'l and its franchisees conspired to recruit sales agents in the business of listing and selling residential real estate in the Northern Ohio area by requiring that all Re/Max brokers pay their respective sales agents 95% to 100% of the brokerage commissions for transactions in which those sales agents participated. (Am. Countercl. ¶¶ 5, 9, 13 & 15). Realty One alleges that as a competitor of Re/Max brokers it is an employer of sales agents and Plaintiffs collectively discourage Re/Max brokers from recruiting sales agents from each other. (Am Countercl. ¶ 9). Realty One states that Plaintiffs' recruitment and disparagement of non-Re/Max sales agents injures Realty One in its ability to recruit and retain "successful" sales agents and deprives Realty One of the competitive value it has invested in those agents. (Am.Countercl. ¶¶ 9, 10, 11 & 19). This conspiracy thereby weakens competition and monopolizes trade and commerce in the brokerage of residential real estate in the Northern Ohio area. (Am.Countercl. ¶¶ 5 & 7).

■ First, the harm claimed by Realty One from Plaintiffs' alleged agreement to discourage Re/Max brokers from recruiting sales agents from each other fails to allege any antitrust injury for which Realty One could claim Clayton Act standing. Realty One and Re/Max brokers are buyers, or consumers if you will, of the labor skills of sales agents. As competitors they create the demand for what the sales agents supply. If one accepts Realty One's allegation that Re/Max brokers do not recruit from each other, then this circumstance would simply decrease the overall demand for sales agents in the relevant market.

Assuming let us say 100 brokers in a market in which each broker could recruit sales agents from other brokers, each broker would have to compete against 99 other brokers to hire a sales agent. In a case where the sales agent is already employed by a Re/Max broker, however, a Realty One broker would not have to compete against other Re/Max brokers for that sales agent's services because Re/Max brokers have apparently agreed not to recruit from each other. If there are for the sake of argument 20 Re/Max brokers in the market, the Realty One broker would have to compete only against the other 79 non-Re/Max brokers, plus the one Re/Max broker with whom the sales agent is currently employed, to hire that sales agent. The field reduces from 99 potential competitors to 80 competitors. Less buyers vie for the same supply of services and the demand for those services decreases. Decreased demand for sales agent services translates into a lower price where the supply of sales agents remains relatively stable. Therefore, the alleged agreement between Re/Max brokers not to recruit other Re/Max sales agents actually benefits Realty One under the circumstances alleged in its Amended Counterclaim. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 336–37, 110 S.Ct. 1884, 1890, 109 L.Ed.2d 333 (1990) ("Respondent was *benefited* rather than harmed if petitioner's pricing policies restricted ARCO sales to a few large dealers. . . ."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) ("these alleged conspiracies could not have caused respondents to suffer an 'antitrust injury,' because they actually tended to benefit respondents") (citations omitted). Instead of alleging that it has been disadvantaged by the competition-reducing effect of the alleged Re/Max no-recruitment agreement, Realty One has alleged a benefit. Realty One complains of an instance where Plaintiffs have allegedly agreed to lessen competition, but that lessening of competition has worked to its benefit not to its injury.

As well, Realty One would not be the *proper party* to complain of the anticompetitive effects of the alleged Re/Max no-recruit-

ment agreement because the sales agents are the ones primarily harmed by the agreement and have more than enough incentive to bring a suit on their own behalf. As the Supreme Court stated, "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 911 (footnote omitted).

Second, Realty One's complaint that Plaintiffs engage in deceptive and anticompetitive recruitment of sales agents by collectively agreeing to pay a significantly greater commission split than has been heretofore been paid to sales agents in Northern Ohio alleges no antitrust injury either. As stated above, Realty One and Re/Max brokers are in competition as buyers for the services supplied by sales agents. Generally, in a bidding war for services, there is nothing anticompetitive about being the highest bidder. As has been often repeated: "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir.1945). Realty One does not allege why they could not bid for the sales agents in the same manner that Re/Max brokers do, nor are there allegations to support that Re/Max has attempted to "corner" the market on sales agents or has attempted to employ its compensation plan as a method of "predatory" pricing. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 116, 107 S.Ct. at 492 (nonpredatory price competition as reflected by prices that are below market price or even below the costs of a firm's rivals is not an activity forbidden by the antitrust law, although selling below one's own cost as well as that of your rivals' to gain a monopolistic advantage is predatory). If Re/Max has a competitive advantage in the market for sales agents, Realty One has not alleged injury flowing from that which makes such a competitive advantage unlawful. Realty One's allegations regarding the recruitment by Plaintiffs of sales agents are dismissed for failure to state a claim for which

relief can be granted under the antitrust laws.

## IX. AGREEMENTS ON BROKER–TO–BROKER COMMISSION SPLITS

Realty One's next substantial allegation is that Plaintiffs have conspired to set the compensation that Re/Max brokers pay other brokers for cooperative transactions in order to raise and stabilize the price of real estate broker services in a *per se* unlawful manner. (Am. Countercl. ¶ 12 & 14). Essentially, Realty One alleges that Re/Max Int'l and the other Re/Max franchisees have entered into a conspiracy to regulate how they deal with brokers outside of the conspiracy on broker-to-broker commission splits. By presenting this united front on the issue of the compensation that Re/Max brokers pay non-Re/Max brokers for cooperative real estate transactions, the conspiracy allegedly weakens competition and monopolizes trade and commerce in the brokerage of residential real estate in the Northern Ohio area. (Am. Countercl. ¶¶ 5 & 7).

First, Realty One's broker-to-broker price fixing allegations fail to sufficiently allege a § 2 conspiracy to monopolize claim. Significantly, Realty One has made no allegations of Plaintiffs' specific intent to monopolize arising from predatory conduct or predatory purpose. Instead Realty One's monopolization allegations merely allege Plaintiffs' efforts to "monopolize trade and commerce in the brokerage of residential real estate" in the Northern Ohio area with the goal of attaining " 'Premier Market Share' and 'Premier Market Presence' with 'overwhelming market dominance' and power." *See* Am.Countercl. ¶¶ 5 & 7. Accepted as true these allegations merely evidence an intention on Plaintiffs' behalf to expand their business at Realty One's expense which in and of itself is a proper goal of lawful competition. As Realty One's monopolization allegations do not give fair notice of how Plaintiffs' goal is exclusionary or predatory they are insufficient to meet the specific intent requirement of a § 2 conspiracy claim.

Second, as is the case with most price-fixing allegations, Realty One's allega-

tions on Plaintiffs' alleged broker-to-broker agreements more justifiably address the anticompetitive aspects of a § 1 conspiracy to restrain trade. Realty One, however, by framing these broker-to-broker price fixing allegations using *per se* language, gives fair notice challenging only the horizontal aspects of these agreements. *Compare* Realty One's Mem.Opp'n at 11 (Docket 90). Of course, an antitrust complaint can put the defendants on notice that the vertical or horizontal aspects of the defendants' relationships, or both, have been placed under antitrust scrutiny. The particulars of that scrutiny are limited, however, to the nonconclusory allegations of the complaint. Where those nonconclusory allegations by their own terms limit themselves to a horizontal or vertical challenge, then the Court is not free to expand the theory of recovery beyond that which is alleged. The use of *per se* language in an antitrust complaint invokes a specific legal connotation that may not be avoided. To the extent that these broker-to-broker agreements could be challenged as illegal § 1 conspiracies in the vertical context, Realty One has made insufficient allegations of anticompetitive effect on competition in relation to a relevant product and geographic market. Thus, any conclusory challenge in Realty One's Amended Counterclaim to Plaintiffs' alleged agreements concerning broker-to-broker commission splits as giving rise to an unlawful § 1 conspiracy in the vertical context fails to state a claim upon which relief can be granted.

█ Third, after sorting through the conclusory allegations surrounding Realty One's broker-to-broker challenge, the Court comes to the substance of paragraphs 5, 7, 12, & 14 of the First Amended Counterclaim, *i.e.,* Plaintiffs have engaged in a horizontal agreement to fix prices which constitutes an unlawful § 1 conspiracy. As set forth above, horizontal conspiracies involve agreements

among competitors at the same level of competition to restrain trade. If Re/Max Int'l and its franchisees prove to be competitors on the same level of competition who are not part of a single firm as defined by *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), then proof that some of those competitors have agreed to set the prices they pay to other competitors for cooperative service transactions would constitute a valid § 1 conspiracy claim. *See generally Goldfarb v. Virginia State Bar Ass'n,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

In *Goldfarb* two residential home buyers challenged the minimum-fee schedule published and enforced by local and state bar associations as applied to fees for legal services relating to residential real estate transactions. The Supreme Court held that "the exchange of such a service for money is 'commerce' in the most common usage of that word," and is governed by the Sherman Act. 421 U.S. at 787–88, 95 S.Ct. at 2013; *id.* at 787, 95 S.Ct. at 2013 ("Indeed, our cases have specifically included the sale of services within § 1.") (citations omitted). As such the bar associations' agreements and enforcement mechanisms concerning their fee-for-service price schedules constituted concerted action amounting to horizontal price fixing in a basically *per se* unlawful restraint of trade under § 1 of the Sherman Act. *Cf. Goldfarb,* 421 U.S. at 782, 95 S.Ct. at 2010 ("here a naked agreement was clearly shown, and the effect on prices is plain").[14] Although *Goldfarb* reflects an instance of unlawful § 1 price fixing where the consumer claimed antitrust injury resulting from agreements among service providers who otherwise would be in competition, consumers are not the only ones who have standing to sue to invalidate these trader agreements.

---

**14.** In *Goldfarb* the Court treated the bar associations' price-fixing agreements as unlawful under § 1, but refrained from enunciating a *per se* rule applicable to all agreements among bar associations and their members only because the professional nature of the business of law "may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." 421

U.S. at 788–89 n. 17, 95 S.Ct. at 2013–14 n. 17. *See also FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458–61, 106 S.Ct. 2009, 2017–19, 90 L.Ed.2d 445 (1986) (Court would not extend *per se* group boycott analysis to horizontal agreements among members of a professional association to withhold from their customers a particular service).

In general, "[g]roup boycotts, or concerted refusals by traders to deal with other traders have long been held to be in the forbidden [§ 1] category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor ... [e]ven when they operated to lower prices or temporarily to stimulate competition...." *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) (analyzing a horizontal refusal to deal upon allegations that a competitor and a distributor conspired not to sell or to sell at discriminatory prices and highly unfavorable terms) (footnote and citations omitted) (explanatory text added).[15] The general rule has been modified, however, by the Supreme Court in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Now a plaintiff seeking application of a *per se* rule for a concerted refusal to deal "must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." 472 U.S. at 298, 105 S.Ct. at 2621. Where "such conspiracies or combinations can potentially increase efficiency in a given market and thus have a purpose other than to be blatant and unreasonable restraints of trade, especially if those acting in concert do not have effective market power" reliance on a *per se* rule will be misplaced. *Tacker v. Wilson*, 830 F.Supp.

422, 427 (W.D.Tenn.1993) (summarizing *Northwest Wholesale* ).

One aspect of that anticompetitiveness is that unlawful § 1 boycotts require collective action among a group of competitors at the same level, *i.e.*, horizontal action. *See Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir.1982) (agreeing with the district court's reasoning); *id.* at 243–45 (single manufacturer/buyer refusal to deal does not state a claim for an unlawful group boycott; nor do allegations of exclusive dealing state a sufficient monopoly claim under § 2 absent allegations of monopolization by the buyer of some product or service market). Moreover, where the action between horizontal actors is collective, the fact that there are collateral vertical aspects to the relationship does not immunize a particular combination from antitrust scrutiny. As the Court explained in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), "[t]he complainant can fare no better with its plan of identical contracts than could the dealers themselves if they formed a combination and endeavored to establish the same [resale price] restrictions, and thus to achieve the same result, by agreement with each other." *Id.* at 408, 31 S.Ct. at 384 (explanatory text added). "But agreements or combinations between dealers, having for their sole pur-

---

15. "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)). But there are exceptions to this general rule. Unilateral refusals to deal for the purpose of acquiring or preserving monopoly power are unlawful. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–79, 93 S.Ct. 1022, 1029–31, 35 L.Ed.2d 359 (1973); *Lorain Journal v. United States*, 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951); *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 854–62 (6th Cir.1979). Thus, "[a] refusal to deal does not become illegal under the Sherman Act unless 'it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly.'" *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802 (6th Cir.1988) (quoting from

the court below quoting *Ace Beer Distributors, Inc. v. Kohn*, 318 F.2d 283, 287 (6th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963)). When evaluating unilateral refusals to deal, the court must appreciate the elements of monopolization and attempted monopolization claims which may be used to challenge those refusals. "The offense of monopoly under § 2 of the Sherman Act consists of two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The offense of attempted monopolization requires a showing of a specific intent to monopolize, anti-competitive conduct, and a dangerous probability of success for achieving monopoly power. *E.g., Tarrant Serv. Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 615 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994).

pose the destruction of competition and the fixing of prices, are injurious to the public interest and void." *Dr. Miles Medical*, 220 U.S. at 408, 31 S.Ct. at 384–85. *See also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) (discussing anticompetitive agreements among dealers and distributors of motion picture films to fix prices under § 1). Where individual dealers collaborate through association and otherwise, among themselves and with their upstream supplier or manufacturer, that collaboration is subject to antitrust scrutiny to determine whether the collaboration has resulted in an unreasonable restraint of trade. *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (group boycott between manufacturer and association of dealers under § 1).[16] *Compare also Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1377 (10th Cir.1979) (wherein the court addressed "whether traders oriented vertically to each other can be found in violation of section 2 by conspiring to monopolize one horizontal market intersecting the vertical arrangement").

In this case since Realty One sufficiently challenges the horizontal aspects of Plaintiffs' alleged agreements on broker-to-broker commission splits, the First Amended Counterclaim states a valid § 1 claim. Furthermore, as a competitor in the market in which the prices are allegedly raised and stabilized by horizontal agreements, Realty One has alleged injury flowing from the unlawful aspects of competition-reducing behavior. Realty One has alleged antitrust injury flowing from the alleged horizontal agreements on broker-to-broker commission splits. Finally, Realty One has antitrust standing to bring a Clayton Act § 4 cause of action to redress these injuries because the harm alleged to it appears intentional, Realty One has alleged it is a competitor in the market in which the prices are fixed, and there appear to be no more direct victims of the alleged violation. Re/Max

Int'l's motion for judgment on the pleadings on Realty One's allegations of Plaintiffs' horizontal conspiracy under § 1 of the Sherman Act to set the compensation that Re/Max brokers pay to other brokers for cooperative transactions is denied.

## X. DISPARAGEMENT

Realty One's vague allegations of disparagement in the antitrust context do not allege antitrust injury. The Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). Mere allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent. *See Broyles v. Wilson*, 812 F.Supp. 651, 655 (M.D.La. 1993) (defamatory comments which may have the effect of damaging a professional reputation are "not the type of conduct the antitrust laws were enacted to prohibit or punish."). *Compare also Merkle Press Inc. v. Merkle*, 519 F.Supp. 50, 53 (D.Md.1981) (entertaining "grave doubts" that misrepresentations made about plaintiff to its customers which prevent plaintiff from competing in its trade thereby resulting in a lessening of competition can give rise to a § 1 violation); *Mar Food Corp. v. Doane*, 405 F.Supp. 730, 730–31 (N.D.Ill.1975) (refusing to recognize that state law unfair competition torts—such as the disparagement of plaintiffs' business—state a claim under § 1 where mere individual injury is alleged). Realty One cites no law to the contrary. Realty One's disparagement allegations fail to state an antitrust claim upon which relief can be granted.

## XI. SHAM LITIGATION

The general rule is that "[t]hose who petition government for redress are generally immune from antitrust immunity." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, —— U.S. ——, ——,

---

**16.** Vertical refusals to deal to enforce nonprice vertical restraints such as exclusive dealing arrangements have been subject to the rule of reason analysis. *Timken Roller Bearing Co. v. Federal Trade Comm'n*, 299 F.2d 839, 842 (6th Cir.), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); *Theee Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1398 (9th Cir.1987).

**160**

113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993). Since the government has the power to act in its representative capacity to restrain trade, the Sherman Act does not punish political activity through which the people freely inform the government of their wishes. *Professional Real Estate,* —— U.S. at ——, 113 S.Ct. at 1926 (explaining the *Noerr–Pennington* doctrine). Where petitioning activity, ostensibly directed toward influencing governmental action, is in actuality a mere sham to cover an attempt to interfere directly with the business relationships of a competitor, then the application of the Sherman Act may be justified. *Professional Real Estate,* —— U.S. at ——, 113 S.Ct. at 1926 (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961)). In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) the Supreme Court expanded the application of these antitrust principles "to the approach of citizens . . . to administrative agencies . . . and to courts." 404 U.S. at 510, 92 S.Ct. at 611–12.

The Supreme Court has cautioned that since the right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances, the antitrust laws will not prohibit the filing of a lawsuit, regardless of one's anticompetitive intent or purpose in doing so, unless the suit is a "mere sham" which "effectively 'bar[s] . . . competitors from meaningful access to adjudicatory tribunals' and so . . . usurp[s] th[e] decisionmaking process." *Professional Real Estate,* —— U.S. at —— – ——, 113 S.Ct. at 1926–27 (explaining *California Motor Transport,* 404 U.S. at 512, 92 S.Ct. at 612). "A sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action at all, not one who genuinely seeks to achieve his governmental result but does so *through improper means.*" *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991) (citations and internal quotation marks omitted). Where, for example, a business indisputably sets out to disrupt a competitor's business relationships, not through the very process of

lobbying, or through the very process of causing a city council to consider zoning measures, "but rather through the ultimate *product* of that lobbying and consideration, viz., the zoning ordinances," then the federal antitrust laws will not prohibit that conduct as it merely reflects the efforts of a private individual in seeking anticompetitive action from the government. *City of Columbia,* 499 U.S. at 379–80 & 381, 111 S.Ct. at 1353–54 & 1354–55.

Merely filing what turn out to be objectively baseless lawsuits does not create an antitrust cause of action if the filer seeks an anticompetitive result only through the "ultimate *product*" or "*outcome*" of those lawsuits, viz., a court judgment. The law is clear that one may petition the government to use its power in its representative capacity to achieve an anticompetitive result, if in actuality that is all that the petitioner is doing. Thus one may petition the courts through the form of a lawsuit to obtain a court judgment which effectuates what private parties would be prohibited from doing by the antitrust laws. Of course, state malicious prosecution and abuse of process laws make baseless actions unlawful, but state illegality in and of itself does not make a federal antitrust claim. More is needed. Significantly, in *California Motor Transport,* the Supreme Court focused on sham activity that allegedly barred "competitors from meaningful access to adjudicatory tribunals. . . ." 404 U.S. at 512, 92 S.Ct. at 612. The *California Motor Transport* case shows how the process of litigation can cause an unreasonable restraint of trade. When the sham activity prevents other competitors in the relevant market from gaining meaningful access to the courts, thus keeping those competitors at a ongoing business disadvantage, an antitrust claim is stated. The antitrust laws prevent litigation from being used as a mere tool to keep other competitors from having access to the same market opportunities that the sham litigator enjoys.

In particular, the Supreme Court has set forth a two-part definition of "sham" litigation.

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant

could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. [Second,] ... if challenged litigation is objectively meritless ... a court examine[s] the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."

*Professional Real Estate,* —— U.S. at ——, 113 S.Ct. at 1928 (citations omitted) (some explanatory text added).

Under the objective prong of the sham litigation test, if the existence of probable cause to institute legal proceedings is shown or if the lawsuit is successful, then one is precluded from demonstrating that the antitrust defendant has engaged in sham litigation. *Id.* at —— n. 5 & ——–——, 113 S.Ct. at 1928 n. 5 & 1929–30. The crucial subjective inquiry in sham cases asks whether the very *"process"* of instituting these lawsuits conceals an attempt to interfere *"directly"* with the business relationships of a competitor. As well, simply because a lawsuit manifests the objective and subjective attributes of a sham does not mean that an antitrust violation has occurred. Importantly, "even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation." *Professional Real Estate,* —— U.S. at ——, 113 S.Ct. at 1928.

Realty One alleges that Plaintiffs in order to achieve a plan of market dominance have agreed to, and then instituted, an uninterrupted program of meritless judicial proceedings against Realty One; and have incited a series of groundless government investigations without probable cause. (Am.Countercl. ¶¶ 17 & 18). Allegedly, these actions have weakened competition and monopolized trade and commerce in the brokerage of residential real estate in the Northern Ohio area. (Am.Countercl. ¶¶ 5 & 7). Realty One's allegations sufficiently allege claims that satisfy the objective prong of the sham litigation test. As well, Realty One's allegation that "[t]he plaintiffs and their co-conspirators have instituted sham lawsuits and caused groundless investigations solely for the purpose of interfering directly with Realty One's business through the legal and investigative process itself rather than through a successful prosecution of lawsuits and investigations," (Am.Countercl. ¶ 18), satisfy the subjective prong of the sham test.

Of course, where this "direct" interference to Realty One's business is alleged to stem from a conspiracy to restrain trade in violation of § 1 of the Sherman Act as well as from a conspiracy to monopolize in violation of § 2 of the Sherman Act, Realty One also must allege claims sufficient to satisfy the elements of these causes of action. As outlined above, other allegations in the Amended Counterclaim sufficiently allege a horizontal conspiracy to restrain trade in violation of § 1 of the Sherman Act. The Amended Counterclaim sufficiently blends these allegations of anticompetitive conduct into those challenging Plaintiffs' alleged sham litigation. By the same token, however, the defects with Realty One's conspiracy to monopolize allegations permeate Realty One's sham claims.

Thus, as to Realty One's claims of a conspiracy to monopolize under § 2 of the Sherman Act by virtue of Plaintiffs' alleged sham activity, Re/Max Int'l's motion for judgment on the pleadings is granted. On the other hand, Realty One's sham litigation and sham government investigation allegations of an illegal antitrust conspiracy under § 1 of the Sherman Act state a claim upon which relief can be granted. As to this allegation of a conspiracy to engage in sham activity causing antitrust injury, the motion of Re/Max Int'l for judgment on the pleadings is denied.

## XII. REALTY ONE'S STATE LAW CLAIMS

Realty One's amended second counterclaim alleges that Plaintiffs tortiously interfered

with Realty One's business relationships. The third counterclaim asserts a complaint for unfair competition. The Court has examined the substance of these allegations and finds them sufficient to survive a motion to dismiss.

Furthermore, the Court finds it inappropriate to rule on Plaintiffs' alternative motion for summary judgment as relevant discovery still remains to be completed. Fed.R.Civ.P. 56(f). Plaintiffs' alternative motion for summary judgment is denied without prejudice as premature.

## XIII. THE ANTITRUST STANDING OF RE/MAX INT'L

The last issue that needs to be addressed is the antitrust standing, or lack thereof, of Re/Max Int'l under § 4 of the Clayton Act. Realty One and Smythe Cramer move for partial summary judgment against Re/Max Int'l on the ground that it lacks antitrust standing (Dockets 54 & 87). Fed.R.Civ.P. 56. *See generally Jones v. United States,* 857 F.Supp. 587, 589–90 (N.D.Ohio 1994) (summarizing the summary judgment standard). In support of its motion Realty One relies upon the deposition excerpts of Daryl Jesperson, Robert B. Fisher, Gail A. Liniger, and David L. Liniger and a standard Re/Max Int'l Franchise Agreement (Realty One's Mot.Partial Summ.J., Ex. 1–4 & 7; Docket 54). Likewise, Smythe Cramer relies upon deposition excerpts of the same witnesses as well as the standard Re/Max Int'l Franchise Agreement (Smythe Cramer's Mot.Partial Summ.J., Ex. 1–5; Docket 87). Re/Max Int'l opposes these motions relying on approximately eleven affidavits, the deposition excerpts of Daryl Jesperson, James L. Crane, Leo Franklin Lee, Jr., Joy Seth Hurd, August A. Yahn, and Edward F. Rybka, as well as numerous accompanying documents (App. Vol. I & II; Dockets 79 & 80). Re/Max Int'l contends it has standing to institute private enforcement actions against Realty One and Smythe Cramer for conspiracy to restrain trade under § 1 of the Sherman Act, and for monopolization, attempted monopolization and conspiracy to monopolize under § 2 of the Sherman Act.

Initially, the parties disagree on the extent to which Defendants' challenge to the antitrust standing of Re/Max Int'l also places antitrust injury in issue. Of course the issues of antitrust injury and antitrust standing are two sides of the same coin and will be addressed accordingly.

### A. *Antitrust Injury.*

The claims of Re/Max Int'l under § 1 and § 2 for conspiracy to restrain trade and to monopolize challenge the alleged horizontal agreements between Realty One and Smythe Cramer to impose punitive adverse commission splits against Plaintiffs in an attempt to preserve market power, or monopoly presence, and to eliminate and unreasonably restrain competition in specified geographic markets for the listing for sale and selling of residential real estate throughout Northeast Ohio. The Claims of Re/Max Int'l under § 2 for unlawful monopolization and unlawful attempt to monopolize challenge the allegedly unilateral conduct of Realty One or Smythe Cramer to preserve or achieve monopoly power in specified geographic markets for the listing for sale and selling of residential real estate throughout Northeast Ohio. Moreover, Re/Max Int'l alleges:

> Defendants' unlawful acts have also occurred in, and have affected, commerce in the relevant product market for the recruitment and retention of experienced and knowledgeable residential real estate sales agents in the same geographic markets referred to ... above. As alleged herein, Defendants have imposed punitive adverse commission splits and made defamatory statements regarding the business of Re/Max in an effort to intimidate and deter real estate sales agents from becoming Re/Max franchisees or becoming affiliated with Re/Max franchisees.

*See* First Am.Compl. ¶ 14.

The First Amended Complaint thus not only provides fair notice of a relevant product market involving the listing and selling of residential real estate, First Am. Compl. ¶ 11, but provides fair notice of a "relevant product market for the recruitment and retention of experienced and knowledgeable residential real estate sales agents ..."

to which Defendants' alleged actions are directed "in an effort to intimidate and deter real estate sales agents from becoming Re/Max franchisees or becoming affiliated with Re/Max franchisees." First Am.Compl. ¶ 14. Injury to Re/Max Int'l flowing from either one or both of these markets attributable to an anticompetitive aspect of the alleged horizontal agreements or monopolistic practices under scrutiny would constitute antitrust injury.[17]

The same principles that sustained Realty One's § 1 claims on the validity of horizontal agreements on broker-to-broker commission splits apply with equal force to Re/Max Int'l's claims of antitrust injury against Realty One and Smythe Cramer. Construing the inferences from the evidence most strongly in favor of Re/Max Int'l, one could find the existence of a horizontal conspiracy whereby Realty One and Smythe Cramer have agreed to set the prices they pay to other competitors for cooperative service transactions by way of broker-to-broker commission splits that reflect those concerted refusals to deal and horizontal price fixing arrangements of the type the antitrust laws were designed to prevent. Moreover, evidence of Realty One's and Smythe Cramer's market power, and/or the dangerous probability that Realty One and Smythe Cramer will secure monopoly power, and the willful, predatory, exclusionary or "punitive" exercise of that power in the relevant markets set forth above, when construed in favor of Re/Max Int'l, reflect the type of monopoly conduct that the antitrust laws were designed to prevent. *See supra* nn. 14–16 and accompanying text. Re/Max Int'l has sufficiently come forward with spe-

cific facts to show its harm is attributable to this anticompetitive aspect of Defendants' alleged conduct. The causal relation between the harm to competition in the two markets set forth above and its resulting injury to Re/Max Int'l is sufficient to state a *proper claim* for *antitrust injury* purposes. The question of whether Re/Max Int'l is the *proper party* to assert that claim is a question directed at antitrust standing. It is to this substantial question which the Court now turns.

### B. *Antitrust Standing.*

A case in which the Supreme Court addressed both "antitrust standing" and "antitrust injury" under § 4 of the Clayton Act is *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready* the Court initially addressed whether plaintiff's "particular injury [was] too remote from the alleged violation to warrant § 4 standing. . . ." 457 U.S. at 477, 102 S.Ct. at 2547. The Court held that the alleged injury to plaintiff—as a consumer of psychotherapy services " 'within that area of the economy endangered by that breakdown of competitive conditions' "—was not too remote, fortuitous or incidental to exclude her as a proper plaintiff from a § 4 remedy. *See id.* at 478–80, 484–85 & n. 21 & 483 n. 19, 102 S.Ct. at 2548–49, 2551 & n. 21 & 2550 n. 19 (rejecting defendant's suggestion that only competitors or non-consumer market participants could sue) (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 129 (9th Cir.1973) (ellipsis and brackets omitted)).[18] After addressing the

---

**17.** Essentially, Realty One and Smythe Cramer invite the Court to read paragraph 14 out of the First Amended Complaint. Realty One acknowledges that the recruitment of real estate brokers can constitute a relevant market, but argues that the parties do not compete in that market. Post-hearing Br. in Supp. at 2–3, Docket 154. Smythe Cramer also denies that any of the parties in this case could participate in such a market unless they "engage[d] in that activity for a living," which, according to Smythe Cramer, none do. Supplemental Mem. in Supp. at 9–10, Docket 157. Obviously, Re/Max Int'l thinks to the contrary and has so alleged in its First Amended Complaint. One may put Re/Max Int'l to its proof, but without citation of case law to the contrary, the Court concludes that the ability

to allege the conceptual space in which competition takes place in order to frame one's antitrust allegations is uniquely within the power of the plaintiff.

**18.** A year later, the Supreme Court brought together the remoteness analysis begun in *McCready* with the announcement of the balancing-of-factors test for antitrust standing in *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). *See McCready*, 457 U.S. at 476 n. 12, 102 S.Ct. at 2546–47 n. 12 (noting that it had been unnecessary to a resolution of the case to adopt any particular standing approach to the "problem of remote antitrust injury"). *Compare also* 457 U.S. at 491, 102

plaintiff's standing, the Court went on to hold "that McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *See McCready*, 457 U.S. at 481–84, 102 S.Ct. at 2549–51. In so holding the *McCready* Court elaborated on the concept of "antitrust injury" first coalesced in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Plaintiff properly stated a claim for antitrust injury because her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *McCready*, 457 U.S. at 484, 102 S.Ct. at 2551.

■ Although the *McCready* decision recognized the distinction between antitrust injury and antitrust standing, the balancing-of-factors test that came to define the concept of antitrust standing in *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) blended "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market" into the five-factor standing inquiry. *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir.1983) (factor two). Thus, the nature of the plaintiff's antitrust injury is significant to whether a plaintiff has standing under § 4 of the Clayton Act to bring a private enforcement action to remedy that injury. Moreover, the dual nature of the relevant markets challenged by Re/Max Int'l complicates the standing analysis. Since the market provides the legal context for injuries which flow from a breakdown of competitive conditions in a sector of the economy, a discussion of antitrust injury without reference to the market becomes abstract and a discussion of antitrust standing becomes incomplete.

Re/Max Int'l refers the Court to essentially two product markets in Northeast Ohio in its attempt to demonstrate that it is a proper party to bring a private enforcement action for the antitrust injury occurring in those markets. The first relevant product market involves the listing and selling of residential real estate in Northeast Ohio, First Am. Compl. ¶ 11, while the second involves the recruitment and retention of experienced and knowledgeable residential real estate sales agents or brokers to which Defendants' alleged actions are directed in an effort to intimidate and deter those individuals from becoming Re/Max franchisees or from becoming affiliated with Re/Max franchisees. First Am.Compl. ¶ 14. In addition, as to each market Re/Max Int'l claims a different status. With these distinctions made, the Court will address the standing of Re/Max Int'l in regards to antitrust injury in each market, focusing at the outset on "factor two" of the *Southaven* paradigm.

### 1. The Market for Residential Real Estate Services in Northeast Ohio.

■ For the first market, Re/Max Int'l contends that its injury as a franchisor of a real estate services system is "inextricably intertwined" with the injury Realty One and/or Smythe Cramer sought to inflict on the market for residential real estate services in Northeast Ohio. Re/Max Int'l contends that its injury is not too remote to place it outside of that class of persons entitled to bring a private enforcement action under § 4 of the Clayton Act. Significantly, Re/Max Int'l does not sell real estate services in the Northeast Ohio residential real estate market just as the plaintiff in *McCready* did not sell psychotherapy services in the psychotherapy market. But unlike the plaintiff in *McCready*, Re/Max Int'l is not a consumer of the services provided in the relevant market. This fact, *i.e.*, Re/Max Int'l neither sells nor consumes residential real estate services in Northeast Ohio, contend Defendants, is dispositive of the antitrust standing issue presented. In essence Defendants ask this Court to rule that the second factor of the *Southaven* paradigm includes a mandatory requirement that a private-enforcement plaintiff be either a "consumer or a competitor in the relevant market" to qualify for

S.Ct. at 2554 ("It may be that the Court today is merely holding that a boycottee has 'standing' to sue under § 4.") (Rehnquist, J., dissenting).

antitrust standing. To better answer this question an examination of the Supreme Court's standing precedent is required.

In *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) the plaintiff labor unions alleged that Associated General Contractors, a membership corporation composed of various building and construction contractors, coerced two classes of persons—(1) landowners and others who let construction contracts, as well as (2) general contractors—to induce those two classes of persons to give some of their business to nonunion firms in a way which "weakened and restrained the trade 'of certain contractors.' ... Thus, particular victims of coercion may have diverted particular contracts to nonunion firms and thereby caused certain unionized subcontractors to lose some business." 459 U.S. at 527–28, 103 S.Ct. at 903. The Supreme Court agreed in principle "that such coercion might violate the antitrust laws." 459 U.S. at 528 & n. 17, 103 S.Ct. at 903 & n. 17. But although these general allegations of antitrust coercion may have stated a valid antitrust claim, "it does not, of course, necessarily follow that still another party—the Union—is a person injured by reason of a violation of the antitrust laws within the meaning of § 4 of the Clayton Act." 459 U.S. at 529, 103 S.Ct. at 904. Thus, the *Associated General Contractors* case dealt with three levels of persons with potential antitrust standing: first, the victims themselves (landowners, contracting parties and general contractors); second, the unionized subcontractors who lost business as a result of the alleged coercion; and third, the union which claimed it was injured "in its 'business activities' " because the harm to the unionized firms at the second level caused consequential damages to itself. 459 U.S. at 541 & n. 46, 103 S.Ct. at 910 & n. 46 (speculating that specific components of the alleged harm to the union might include lost dues revenues caused when unionized firms were forced to layoff or hire fewer union workers). Importantly, of these three levels of potential § 4 Clayton Act plaintiffs only the third level, the union, was held to be without antitrust standing. *See* 459 U.S. at 545, 103 S.Ct. at 912 ("We conclude ... that

the Union's allegations of consequential harm resulting from a violation of the antitrust laws ... are insufficient as a matter of law.").

In particular, the Supreme Court made clear in *Associated General Contractors* that just because one was not an immediate victim of anticompetitive conduct did not preclude antitrust standing. When explaining the lack of standing of the union, the Court made an important observation: "If either these *firms,* or *the immediate victims of coercion* by defendants, have been injured by an antitrust violation, their injuries would be direct and ... they would have a right to maintain their own treble-damages actions against defendants." 459 U.S. at 541, 103 S.Ct. at 910 (emphasis added). The "firms" who were not "immediate victims of coercion," but who nevertheless qualified for direct-injury antitrust standing, were in fact certain construction contractors and subcontractors who suffered diversions of business as a result of the coercion applied by defendants "against certain landowners and other contracting parties." 459 U.S. at 540–41, 103 S.Ct. at 909–10. Those "firms" suffered direct injury at the second level even though the defendants directed their anticompetitive conduct against those entities who were purchasers of the firms' construction services at the first level, *i.e.,* the landowners and other contracting parties. Re/Max Int'l contends that it stands in a place similar to the "firms" discussed in *Associated General Contractors* in regards to the market for residential real estate services in Northeast Ohio. Although perhaps not an immediate victim of Defendants' antitrust coercion, Re/Max Int'l contends that it has come forward with specific facts showing an intended, direct and independent pocketbook injury as a result of the coercion applied against the market for residential real estate services in Northeast Ohio.

The Supreme Court in *Associated General Contractors* held that victims of "direct" antitrust injury as well as those suffering "immediate" antitrust injury are in parallel positions for standing purposes. *See* 459 U.S. at 540–41 n. 44, 103 S.Ct. at 909–10 n. 44. In explaining the concept of direct injury, the Court analogized the status of the plaintiff in

*Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) to that of a building contractor who, as an immediate victim, had been coerced into a refusal-to-deal agreement in the case of *Connell Construction Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). *See Associated Gen. Contractors,* 459 U.S. at 540 n. 44, 103 S.Ct. at 909–10 n. 44. The Court wrote:

> Similarly, in the *McCready* case, the plaintiff was the direct victim of unlawful coercion. As the Court noted, "McCready did not yield to Blue Shield's coercive pressure, but bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services." 457 U.S., at 483 [102 S.Ct., at 2551]. Her status was thus comparable to that of a contracting or subcontracting firm that refused to yield to the defendants' coercive practices and therefore suffered whatever sanction that coercion imposed. Like McCready, and like Connell Construction Co., such a firm could maintain an action against the defendants. In contrast the Union is neither a participant in the market for construction contracts or subcontracts nor a direct victim of the defendants' coercive practices. We therefore need not decide whether the direct victim of a boycott, who suffers a type of injury unrelated to antitrust policy, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market.

*Associated General Contractors,* 459 U.S. at 540–41 n. 44, 103 S.Ct. at 909–10 n. 44. The plaintiff in *McCready* was not the target of the "coercive pressure" as was the plaintiff in *Connell Construction,* but because she bore the sanction which resulted from that coercive pressure she had a status "comparable" to that which the construction firm in *Connell Construction* enjoyed. This "comparable" status bolstered the Court's conclusion that McCready was a "direct victim" of the antitrust restrictions suffered by her psychologist. 459 U.S. at 540, 103 S.Ct. at 909. Perhaps even more to the point, however, was the Supreme Court's recognition that there can be direct victims of antitrust injury who are not market participants yet have potential antitrust standing. *Cf.* 459 U.S. at 540 n. 44, 103 S.Ct. at 909–10 n. 44 ("In contrast the Union *is neither a participant* in the market for construction contracts or subcontracts *nor a direct victim* of the defendants' coercive practices.") (emphasis added).[19] It is the status of a direct victim who sustains injury related to an illegal antitrust refusal to deal that Re/Max Int'l seeks to achieve.

■ When *Associated General Contractors* is viewed in this light it is clear that the "second factor" of the *Southaven* paradigm does not include a mandatory requirement that a private-enforcement plaintiff be either a "consumer or a competitor in the relevant market" to qualify for antitrust standing. Although consumer or competitor status can be critical or even determinative in a given case, the balancing-of-factors test does not set forth a *per se* rule.[20] A case where consumer or competitor status made the difference was in *Southaven.*

In *Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983) the plaintiff Southaven Land Company owned certain real estate which it wanted to lease to a prospective client; but the current tenant,

---

**19.** The question reserved by *Associated General Contractors* in note 44 for cases where a direct victim of a boycott fails to suffer a type of injury related to antitrust policy is not presented here as Re/Max Int'l has introduced evidence that it suffers antitrust injury. Unlike the question reserved by the *Associated General Contractors* Court, here the question properly framed would be whether a direct victim of a boycott who suffers a type of injury *related* to antitrust policy, but who is not an immediate victim, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market. *Compare* 459 U.S. at 541 n. 44, 103 S.Ct. at 910 n. 44.

**20.** The Court agrees with the point made by Smythe Cramer that the market "participant" discussed in *Associated General Contractors* and *Southaven* is a synonym for a market "competitor." *See* Supplemental Mem., Docket 157 at 3–4. This Court simply does not agree that whether one is a market participant/competitor or a consumer describes the class of all "persons" who can qualify for antitrust standing under § 4 of the Clayton Act under the balancing-of-factors approach.

defendant Malone & Hyde, Inc., did not want to terminate the lease prematurely. The alleged reason why Malone would not agree to terminate the lease was that the prospective tenant was a competitor of Malone in the grocery business and Malone wanted to maintain its monopoly position in the area as long as possible. 715 F.2d at 1080–81. In *Southaven* the Sixth Circuit did not engage in an analysis of antitrust injury apart from its analysis of antitrust standing. Instead, it recognized that *"McCready* injects into the § 4 inquiry elements of proximity and directness which were deemed impermissible by this Court in [prior opinions]." 715 F.2d at 1084 (citation omitted). With that in mind, the *Southaven* court proceeded to address the antitrust injury requirement by focusing on "factor two" of the balancing-of-interests standing test. *See* 715 F.2d at 1085–86 ("A significant element of the § 4 'standing' inquiry is the nature of the plaintiff's alleged injury either as a 'customer' or 'participant' in the 'relevant market.'").

The *Southaven* court found that even though plaintiff was "neither a consumer, competitor or participant [in the retail grocery area of Southaven, Mississippi]," plaintiff could satisfy the factor-two inquiry if its injury was " 'inextricably intertwined' with the injury sought to be inflicted upon the relevant market or participants therein...." 715 F.2d at 1086 (citing *McCready*, 457 U.S. at 483, 102 S.Ct. at 2550). When the Court made the next step and concluded that plaintiff's injury was not "otherwise inextricably intertwined with any [consumer, customer, competitor or participant in the relevant market] ..." the Court concluded that "[plaintiff's] injury [was] not sufficiently linked to the pro-competitive policy of the antitrust laws" to satisfy factor two. *See* 715 F.2d at 1087 (explanatory text added) (footnote omitted). Of course, where a plaintiff's injury is not linked to the "pro-competitive policy of the antitrust laws," plaintiff in effect has failed to demonstrate "antitrust injury." *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (injury "will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny ...").

Under the Sixth Circuit approach, a plaintiff's injury is "inextricably intertwined" when the plaintiff is " 'manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographic markets.' " *Bodie–Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 291 (6th Cir.1992) (quoting and interpreting *Southaven*, 715 F.2d at 1086). By way of illustration using the facts of *McCready, supra,* the *Southaven* Court explained,

> Through economic incentives, the conspirators were alleged to have channeled "consumers" of psychotherapeutic services, such as McCready and her class, to effect [sic] an economic boycott of competitors of psychiatrists in the relevant market. This manipulation of a class of consumers of psychotherapeutic services served to "inextricably intertwine[ ]" their injuries with those injuries sought by the conspirators to be inflicted upon participants in the psychotherapy market.

715 F.2d at 1086.

In this case, Re/Max Int'l cannot sustain the proposition that it is somehow the fulcrum, conduit or market force used by Defendants to achieve a suppression of competition in the market for residential real estate services in Northeast Ohio. Instead, it is the Re/Max franchisees which have been manipulated by Defendants' alleged concerted refusals to deal and monopolistic practices to keep Re/Max Int'l from expanding its Re/Max system in the Northeast Ohio residential real estate market. Thus, this case turns the "inextricably intertwined injury" example used in *Southaven* on its head. Instead of the plaintiff being used as the fulcrum to inflict antitrust injury on competitors in the market, competitors in the market are being used as the fulcrum to inflict antitrust injury on the plaintiff. To say this injury is not the inextricable one anticipated by the Court in *Bodie–Rickett*, however, does not answer the question of whether other degrees of "intertwining" may fall within the area of congressional concern so as to satisfy the Clayton Act § 4 inquiry.

The significance of this realization lies not so much in that Re/Max Int'l cannot meet the definition of "inextricably intertwined injury" summarized in *Bodie–Rickett* (which indeed it cannot); rather the significance lies in the overarching holding of *Southaven* that courts "shall henceforth implement the Supreme Court's directive to consider the § 4 inquiry on a case by case basis by applying the criteria mandated by *Associated General Contractors*." 715 F.2d at 1086. Try as it might, this Court cannot fit the "square peg" of the injury claimed by Re/Max Int'l into the "round hole" presented by the "inextricable intertwining" example set forth in *Southaven*. That failing, however, does not absolve the Court from making an independent inquiry into antitrust standing "on a case by case basis."

The case-by-case inquiry required for factor two is further illustrated by the Supreme Court's concern in *Associated General Contractors* as to whether the interests of the plaintiff, a labor union, "would be served or disserved by enhanced competition in the market." 459 U.S. at 539, 103 S.Ct. at 909. As the primary goal of a labor union "indeed may actually be harmed, by uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over their rivals," the Supreme Court found that the anticompetitive labor-market interests of the Union predominated over the interests that the antitrust laws were designed to protect. 459 U.S. at 539–40, 103 S.Ct. at 909. This case, however, is to the contrary. Re/Max Int'l premises its claims on its belief that its superior real estate system will flourish in an unrestrained market. Re/Max Int'l contends that it welcomes the enhanced competition that will flow from real estate brokers striving to reduce costs in order to obtain a competitive advantage over their rivals.

Given the Court's interpretation of the holdings of *Associated General Contractors* regarding direct injury and the enhancement of competition, and the holdings of *Southaven* regarding the intertwined injury concept, the Court finds that the second factor of the antitrust standing test is not dispositive of the ability of Re/Max Int'l to bring a private

enforcement action to redress the harm to it that has flowed from the alleged antitrust injuries to the market for residential real estate services in Northeast Ohio. Nevertheless, the Court recognizes that Re/Max Int'l presents a claim of direct injury that is not nearly as strong as it would be if Re/Max Int'l were a consumer or a competitor/participant in the residential real estate services market. By the same token Re/Max Int'l does not present a case of intertwined injury, inextricable or otherwise, as strong as that presented in cases that have recognized standing for more remote antitrust litigants. *Compare Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962–63 (10th Cir.) (plaintiff hospital, although not a direct participant in the provision of health care financing, was, by virtue of its affiliation of other providers of health care financing, perceived as a competitor of the defendant health care financier such that plaintiff had antitrust standing to complain of the anticompetitive manipulation of the health care financing market), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). The second *Southaven* factor weighs against recognizing antitrust standing on behalf of Re/Max Int'l to bring a private enforcement action for injuries to the market for residential real estate services in Northeast Ohio.

The next standing factor that the Court will consider is the first set out in *Southaven*: "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused." This factor weighs in favor of granting antitrust standing to Re/Max Int'l. There is evidence to suggest that Realty One and/or Smythe Cramer intended to constrain the market for residential real estate services in Northeast Ohio in order to thwart the expansion of the Re/Max system. Construed most strongly in favor of Re/Max Int'l, the evidence suggests that the harm to the residential real estate market caused Re/Max Int'l to lose income which it otherwise would have earned. Of course the evidence in Defendants' favor that their conduct was unilateral and not an unlawful exercise of monopoly power is not considered on a motion for summary judgment.

The third *Southaven* factor which considers "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative" favors neither side of the standing issue. Re/Max Int'l claims a second level injury and is not an immediate victim of the harm to the market for residential real estate services. On the other hand, the evidence construed in favor of Re/Max Int'l reflects sufficient evidence to show that its independent losses of income from the harm to the residential real estate market are not speculative. Testimony and affidavits by brokers or sales associates who chose not to affiliate with Re/Max provide sufficient evidence on which to estimate the rate at which Re/Max Int'l's earnings have been suppressed. *Compare J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (court must decide whether the evidence supports plaintiff's claim of antitrust injury before it can apply the leniency standard to evidence of damages). The Court need not accept Re/Max Int'l's position that a franchisor always has antitrust standing to complain of its own injuries that result from anticompetitive harm to the market in which its franchisees operate, to recognize that there is a degree of interdependence between the franchisor in this case and its franchisees. In this case, however, the Court does not find this degree of interdependence sufficient to tilt the third *Southaven* factor in favor of standing. This third factor favors neither side.

As to the fourth factor which considers "the potential for duplicative recovery or complex apportionment of damages," the Court finds that damages claimed by Re/Max Int'l are separable from the damages claimed by its franchisees. Due to the unique flat-fee structure of the Re/Max franchise system the calculation of damages suffered by Re/Max Int'l does not appear to be unduly complex. The damages claimed by Re/Max franchisees which result from unfavorable commission splits are quite different from the flat-fee damages that Re/Max Int'l claims. The more complex issues of estimating lost home sales and lost commissions as a result of Defendants' alleged conduct are avoided when one considers the damages of Re/Max

Int'l. Re/Max Int'l has introduced sufficient evidence of injuries to itself separate from the damages claimed by its franchisees. The fourth factor favors a recognition of standing.

As to the fifth factor, the Court agrees with Defendants that the Re/Max franchisees constitute an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement. This factor weighs heavily in favor of denying standing to Re/Max Int'l. Furthermore, denying a remedy to Re/Max Int'l in this case would not likely leave significant antitrust injuries unremedied because of the other Re/Max plaintiffs in this lawsuit. *Cf. Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 911. *Compare also Southaven*, 715 F.2d at 1086 n. 9 (reserving the question of whether the standing factors are exhaustive or merely illustrative). "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 911 (footnote omitted).

Here, only the first and fourth factors favor granting antitrust standing to Re/Max Int'l to complain of harms resulting from antitrust injuries to the market for residential real estate services in Northeast Ohio. The second and fifth factors heavily favor a denial of standing, while the third factor favors neither side. On balance the Court finds that Re/Max Int'l has failed to demonstrate that its damages flowing from the alleged injury inflicted on the market for residential real estate services in Northeast Ohio fall within the area of congressional concern to entitle it to bring a private enforcement action to remedy that anticompetitive conduct under § 4 of the Clayton Act.[21]

2. *The Market for the Recruitment and Retention of Residential Real Estate Agents.*

■ For the second market, Re/Max Int'l contends that its injury as a franchisor of a

---

**21.** Even if the Court were to find that the third factor favored a grant of standing, the second

and fifth factors would still predominate under the circumstances of this case.

real estate service system is the very injury which Realty One and/or Smythe Cramer sought to inflict on the market for the recruitment and retention of real estate agents or brokers to become Re/Max franchisees or affiliates in Northeast Ohio. Re/Max Int'l contends that as an immediate victim of Defendants' antitrust coercion, it has come forward with specific facts showing an intended, direct and independent pocketbook injury as a result of the coercion applied against this second market. Unlike the injury claimed to the market for residential real estate services in Northeast Ohio, the antitrust injury to this second market is such that the standing of Re/Max Int'l to bring a private enforcement action for that injury is straightforward. *See Potters Medical Ctr. v. City Hosp. Ass'n,* 800 F.2d 568 (6th Cir.1986) (hospital could assert an antitrust claim for anticompetitive conduct by competing hospital that reduced the supply of physicians). First, as to this second market the causal connection is direct and the harm intentional. Second, the evidence creates a genuine dispute as to whether Re/Max Int'l, Realty One and Smythe are competitors in this market. The nature of the alleged injury is such that the injury restricts free competition in this market and Re/Max Int'l will benefit from a reduction of barriers to that competition. Third, the evidence construed in favor of Re/Max Int'l shows that it is an immediate victim of the alleged anticompetitive conduct whose damages can be calculated without speculation. Fourth, as outlined above, the lost fees which are attributable to the alleged anticompetitive injury to this market are separable from the commission type damages claimed by the Re/Max franchisees. Fifth, as to this second market there is no more direct victim of the anticompetitive conduct alleged. Although, Realty One and Smythe Cramer have introduced statements from Re/Max Int'l personnel to the effect that Re/Max Int'l does not compete in this alleged market, other evidence indicates that both Re/Max Int'l and defendants do. The Court may not resolve this genuine dispute on a motion for summary judgment.

On balance the Court finds that Re/Max Int'l has introduced sufficient evidence in response to Defendants' motions for partial summary judgment to demonstrate that its damages flowing from the alleged injury inflicted on the market for the recruitment and retention of real estate sales agents or brokers in Northeast Ohio fall within the area of congressional concern to entitle it to bring a private enforcement action to remedy that anticompetitive conduct under § 4 of the Clayton Act. To this extent, the motions of Realty One and Smythe Cramer for partial summary judgment on the issue of Re/Max Int'l's antitrust standing are denied.

Furthermore, the Court finds it inappropriate to rule on Realty One's partial motion for summary judgment against Re/Max Int'l on the statute of limitations defense since relevant discovery remains to be finished. Fed.R.Civ.P. 56(f). Realty One's motion for partial summary judgment on the statute of limitations defense is denied without prejudice as premature. Likewise, Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on Re/Max Int'l's state law claims contained in Counts VIII, IX and X of the Amended Complaint are denied without prejudice as premature.

## XIV. CONCLUSION

For the reasons set forth above, the motion of Plaintiffs, Re/Max International, Inc. and associated franchisees, for judgment on the pleadings (Docket 17–1) is granted in that Defendant Realty One, Inc. has failed to state a claim upon which relief can be granted in its Amended First Counterclaim except to the extent that Realty One complains (1) of an illegal horizontal conspiracy on behalf of Plaintiffs under § 1 of the Sherman Act to set the compensation that Re/Max brokers pay to other brokers for cooperative transactions; and (2) of an illegal horizontal conspiracy on behalf of Plaintiffs under § 1 of the Sherman Act to conduct sham litigation and sham government investigatory activity. Plaintiffs' motion for judgment on the pleadings (Docket 17–1) with respect to Realty One's Amended Second Counterclaim and Amended Third Counterclaim is denied.

Plaintiffs' alternative motion for summary judgment (Docket 17–2) is denied without

prejudice as premature. Likewise, Realty One's motion for partial summary judgment against Re/Max Int'l on the statute of limitations defense (Docket 54–2) is denied without prejudice as premature.

Finally, Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on the issue of antitrust standing (Dockets 54–1 & 87) are granted except to the extent that Re/Max Int'l asserts a private enforcement action under § 4 of the Clayton Act pursuant to Counts I, II, III, IV, V, VI, or VII of the Amended Complaint for damages flowing from the alleged injury inflicted on the market for the recruitment and retention of real estate sales agents or brokers in Northeast Ohio. Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on Re/Max Int'l's state law claims contained in Counts VIII, IX and X of the Amended Complaint are denied without prejudice as premature.

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion issued contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the motion of Plaintiffs, Re/Max International, Inc. and associated franchisees, A.E.B.T.S., Inc. ("Re/Max Crossroads"), and T.M.A.T.N.B., Inc. ("Re/Max Affinity"), D.F.I., Inc. ("Re/Max Results"), Joseph P. Grady, Inc. ("Re/Max Xpress Realty"), McGrew Realty, Inc. ("Re/Max Key Realty"), and Property Professionals, Inc. ("Re/Max Property Professionals") for judgment on the pleadings or for summary judgment (Docket 17) is granted in part and denied in part; and the motion of Defendants Realty One, Inc. and Smythe, Cramer Company for partial summary judgment (Dockets 54 & 87) are granted in part and denied in part.

In particular, the motion of Plaintiffs, Re/Max International, Inc. and associated franchisees, for judgment on the pleadings (Docket 17–1) is granted in that Defendant Realty One, Inc. has failed to state a claim upon which relief can be granted in its Amended First Counterclaim except to the

extent that Realty One complains (1) of an illegal horizontal conspiracy on behalf of Plaintiffs under § 1 of the Sherman Act to set the compensation that Re/Max brokers pay to other brokers for cooperative transactions; and (2) of an illegal horizontal conspiracy on behalf of Plaintiffs under § 1 of the Sherman Act to conduct sham litigation and sham government investigatory activity. Plaintiffs' motion for judgment on the pleadings (Docket 17–1) with respect to Realty One's Amended Second Counterclaim and Amended Third Counterclaim is denied.

Plaintiffs' alternative motion for summary judgment (Docket 17–2) is denied without prejudice as premature. Likewise, Realty One's motion for partial summary judgment against Re/Max Int'l on the statute of limitations defense (Docket 54–2) is denied without prejudice as premature.

Finally, Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on the issue of antitrust standing (Dockets 54–1 & 87) are granted except to the extent that Re/Max Int'l asserts a private enforcement action under § 4 of the Clayton Act pursuant to Counts I, II, III, IV, V, VI, or VII of the Amended Complaint for damages flowing from the alleged injury inflicted on the market for the recruitment and retention of real estate sales agents or brokers in Northeast Ohio. Realty One's and Smythe Cramer's motions for partial summary judgment against Re/Max Int'l on Re/Max Int'l's state law claims contained in Counts VIII, IX and X of the Amended Complaint are denied without prejudice as premature.

IT IS SO ORDERED.